**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VAN LEEUWEN ICE CREAM LLC,<br>Plaintiff,<br>vs.<br>REBEL CREAMERY LLC,<br>Defendant. | Civil Action No. 1:21-cv-02356-EK-JRC<br><br>**VAN LEEUWEN ICE CREAM LLC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

PROPOSED FINDINGS OF FACT .......... 2

I. Van Leeuwen Designs the "Norm-Breaking" Van Leeuwen Trade Dress .......... 2

II. Rebel Knowingly Launches Packaging that Infringes the Van Leeuwen Trade Dress .......... 6

III. Rebel's Packaging Enables Rebel to Compete with Premium Ice Cream Brands—Including Van Leeuwen .......... 8

IV. Rebel's Packaging Causes Confusion and Harms Van Leeuwen .......... 10

PROPOSED CONCLUSIONS OF LAW .......... 13

I. Count I: Trade Dress Infringement (15 U.S.C. § 1125(a)(1)(A)) .......... 13

A. The Van Leeuwen Trade Dress Is Inherently Distinctive .......... 13

1. The Van Leeuwen Trade Dress Is Arbitrary/Fanciful (or Suggestive) .......... 13

2. Van Leeuwen Has Not "Moved Away From" the Van Leeuwen Trade Dress .......... 15

B. The Rebel Trade Dress Causes Confusion .......... 16

1. Strength of the Mark .......... 17

2. Similarity Between the Two Marks .......... 17

3. Proximity of the Products .......... 18

4. Bridging the Gap .......... 19

5. Actual Confusion .......... 19

6. Bad faith .......... 20

7. Quality of Defendant's Products .......... 21

8. Sophistication of the Buyers .......... 21

9. Balancing *Polaroid* Factors ..... 21

II. Count II: Reverse Confusion Under the Lanham Act (15 U.S.C. § 1114(1)) ..... 21

III. Count III: Common Law Trade Dress Infringement and Unfair Competition ..... 22

IV. Count IV: Dilution (New York General Business Law § 360-l) ..... 22

V. Rebel's Good Faith Remote User Affirmative Defense ..... 23

VI. Relief ..... 23

A. Permanent Injunction ..... 23

B. Accounting of Profits ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
257 F. Supp. 3d 611 (S.D.N.Y. 2017)....................19

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
933 F.3d 202 (2d Cir. 2019)....................24

*AmBrit, Inc. v. Kraft, Inc.*,
812 F.2d 1531 (11th Cir. 1986) ....................17, 21

*Anthony Vince Nail Spa, Inc. v. Palazzo Nail Spa, Inc.*,
2018 WL 3420013 (N.D.N.Y. July 13, 2018) ....................22

*Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*,
7 F. Supp. 3d 385 (S.D.N.Y. 2014)....................21

*Capri Sun GmbH v. Am. Beverage Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022)....................19

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
348 F. Supp. 2d 217 (S.D.N.Y. 2,004)....................20

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
696 F.3d 206 (2d Cir. 2012)....................15

*Classic Touch Decor, Inc. v. Michael Aram, Inc.*,
2015 WL 6442394 (E.D.N.Y. Oct. 23, 2015)....................16

*Clinique Lab'ys, Inc. v. Dep Corp.*,
945 F. Supp. 547 (S.D.N.Y. 1996)....................16, 17, 18, 20

*Com. Foods, Inc. v. PLC Com. Corp.*,
504 F. Supp. 190 (S.D.N.Y. 1980)....................23

*Coty, Inc. v. Excell Brands, LLC*,
277 F. Supp. 3d 425 (S.D.N.Y. 2017).................... *passim*

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*,
440 F. Supp. 2d 249 (S.D.N.Y. 2006)....................22

*Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*,
626 F. Supp. 3d 635 (S.D.N.Y. 2022)....................22, 24

*Fourth Toro Fam. Ltd. P'ship v. PV Bakery, Inc.*,
88 F. Supp. 2d 188 (S.D.N.Y. 2000)....................25

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
111 F.3d 993 (2d Cir. 1997)....................13, 14, 17, 15, 19

*George Basch Co. v. Blue Coral, Inc.*,
968 F.2d 1532 (2d Cir. 1992)....................24

*Gross v. Bare Escentuals Beauty, Inc.*,
641 F. Supp. 2d 175 (S.D.N.Y. 2008)....................14, 17, 25

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
826 F.3d 27 (2d Cir. 2016)....................19, 20, 21

*Hasbro, Inc. v. Lanard Toys*, *Ltd.*,
858 F.2d 70 (2d Cir. 1988)....................18

*International Info. Sys. Sec. Certification Consortium, Inc. v. Security Univ., LLC*,
823 F.3d 153 (2d Cir. 2016)....................16

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013)....................22

*Majestic Drug Co. v. Olla Beauty Supply, Inc*.,
1997 WL 37955 (S.D.N.Y. Jan. 31, 1997) ....................14

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................25

*Nabisco, Inc. v. PF Brands, Inc.*,
191 F.3d 208 (2d Cir. 1999)....................21

*Paddington Corp. v. Attiki Importers & Distributors, Inc.*,
996 F.2d 577 (2d Cir. 1993).................... *passim*

*Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*,
486 F. Supp. 414 (S.D.N.Y. 1980)....................16

*Polaroid Corp. v. Polaroid Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961)....................16, 21

*Ritani, LLC v. Aghjayan*,
880 F. Supp. 2d 425 (S.D.N.Y. 2012)....................22

*Romag Fasteners, Inc v. Fossil, Inc.*,
590 U.S. 212 (2020)....................24

*Rose Art Indus., Inc. v. Swanson*,
235 F.3d 165 (3d Cir. 2000)....................15

*Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*,
899 F. Supp. 1204 (S.D.N.Y. 1995)....................7

*Sara Lee Corp. v. Kayser-Roth Corp.*,
1992 WL 436279 (M.D.N.C. Dec. 1, 1992) ....................15

*Solid 21, Inc. v. Richemont N. Am., Inc.*,
2023 WL 3996530 (S.D.N.Y. June 14, 2023) ....................19

*Truck Equipment Service Co. v. Fruehauf Corp.*,
536 F.2d 1210 (8th Cir. 1976) ....................25

*Tuccillo v. Geisha NYC, LLC*,
635 F. Supp. 2d 227 (E.D.N.Y. 2009) ....................23

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
800 F. Supp. 2d 515 (S.D.N.Y. 2011)....................19

*Uber Inc. v. Uber Techs., Inc.*,
521 F. Supp. 3d 455 (S.D.N.Y. 2021)....................22

*W. E. Bassett Co. v. Revlon, Inc.*,
435 F.2d 656 (2d Cir. 1970)....................25

**Statutes**

15 U.S.C. § 1114(1) ....................21

15 U.S.C. § 1116(a) ....................23

15 U.S.C. § 1117(a) ....................23

15 U.S.C. § 1125(a)(1)(A) ....................13

N.Y. Gen. Bus. Law § 360-I ....................22, 23

**Other Authorities**

4 McCarthy on Trademarks and Unfair Competition § 26:9 (5th ed.) ....................23

# TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| Van Leeuwen Pretrial Brief Ex. 1 | Excerpts from Ben Van Leeuwen Deposition Transcript |
| Van Leeuwen Pretrial Brief Ex. 2 | Excerpts from Austin Archibald Deposition Transcript |
| Van Leeuwen Pretrial Brief Ex. 3 | Excerpts from Courtney Archibald Deposition Transcript |
| Van Leeuwen Pretrial Brief Ex. 4 | Van Leeuwen's Third Supplemental Responses to Rebel First Set of Interrogatories |
| DX1006 | Pentagram presentation re Van Leeuwen Design Overview, 11-30-2015 |
| DX1007 | Email from P. Van Leeuwen to B. Van Leeuwen, L. O'Neill re Re: Round 1 \| Van Leeuwen Design Presentation |
| DX1009 | Image of Eclipse Ice Cream Pints |
| DX1010 | Image of Morgenstern's Ice Cream Pints |
| DX1011 | Image of Jeni's Ice Cream Pints |
| DX1012 | Image of normal Ice Cream Pints |
| DX1013 | Image of Ripple Ice Cream Pints |
| DX1014 | Image of Morgenstern's Ice Cream Pints |
| DX1015 | Image of Wildgood Ice Cream Pints |
| DX1016 | Image of Artic Zero Ice Cream Pints |
| DX1017 | Image of Bridgeman's Ice Cream Pints |
| DX1018 | Image of Craig's Ice Cream Pints |
| DX1019 | Image of Van Leeuwen Ice Cream Pints |
| DX1025 | Expert Report of Phillip Brida |
| DX1028 | Expert Report of Mark Keegan |
| DX1031 | Van Leeuwen's Second Supplemental Responses to Rebel's First Set of Interrogatories |
| DX1047 | Email from B. Van Leeuwen to L. O'Neill, P. Van Leeuwen, C. Segal re Can we sue? |

| Exhibit | Description |
|---|---|
| DX1058 | Image of bettergoods Chocolate Covered Cherries Premium Ice Cream Pints |
| DX1059 | Image of bettergoods Cold Brew Coffee Premium Ice Cream Pints |
| DX1060 | Image of bettergoods Double Vanilla Premium Ice Cream Pints |
| DX1061 | Image of bettergoods Dulce De Leche Premium Ice Cream Pints |
| DX1062 | Image of bettergoods in bettergoods Walmart Ice Cream Pints |
| DX1063 | Image of bettergoods Pistachio Salted Caramel Premium Ice Cream Pints |
| DX1064 | Image of bettergoods Strawberries Cream Premium Ice Cream Pints |
| DX1065 | Image of bettergoods Ultimate Chocolate Ice Cream Pints |
| DX1066 | Image of Boba x Ice Cream The Signature Pack Ice Cream Pints |
| DX1067 | Image of Boba x Ice Cream The Signature Pack 2 Ice Cream Pints |
| DX1068 | Image of Cado Avocado Dairy Free Ice Cream Mint Choc Chip Ice Cream Pints |
| DX1069 | Image of Collection Packs – Boba x Ice Cream Pints |
| DX1070 | Image of Craig’s Vegan Ice Cream Pints |
| DX1071 | Image of Milk Bar Ice Cream Pints |
| DX1072 | Image of Fronen Dairy Free Healthy Nice Cream Pints |
| DX1073 | Image of Fronen Foods Our Story |
| DX1074 | Image of Fronen Foods Ice Cream Pints |
| DX1075 | Image of Fronen Foods Store Locator |
| DX1076 | Image of Fronen Foods Why Fronen |
| DX1077 | Image of Jeni’s Splendid Ice Creams Double Dough Ice Cream Pints |
| DX1078 | Image of Jeni’s Splendid Ice Cream Pints |
| DX1079 | Image of Jeni’s Splendid Ice Creams Green Mint Chip Ice Cream Pints |
| DX1080 | Image of Jeni’s Splendid Ice Creams Wedding Cake Ice Cream Pints |
| DX1081 | Image of Choose Your Own 4 Pack Morgenstern’s Finest Ice Cream Pints |
| DX1082 | Image of normal Ice Cream Pints |
| DX1083 | Image of normal Ice Cream Pints |
| DX1084 | Image of normal butter berry Ice Cream Pints |
| DX1085 | Image of Eclipse Ice Cream Pints |
| DX1088 | Image of normal saltine sandwiches Ice Cream Pints |
| DX1089 | Image of normal Ice Cream Pints |

| Exhibit | Description |
|---|---|
| DX1090 | Image of normal Ice Cream Pints |
| DX1091 | Image of normal ice cream Store Page |
| DX1092 | Image of normal ice cream Store Page |
| JX01 | Proposal from Pentagram to Van Leeuwen |
| JX03 | Package design presentation from Pentagram |
| JX04 | Van Leeuwen package design presentation from Pentagram, dated 1/27/2016 |
| JX05 | Image of color palette and lid designs for Van Leeuwen Ice Cream Pints |
| JX12 | Email from L. O'Neill to B. Van Leeuwen, P. Van Leeuwen re Re: Packaging home run |
| JX14 | Instagram Post by @rebelcreamery |
| JX16 | Statement of Work between Ernst & Young LLP and Rebel Creamery LLC |
| JX17 | Project Chip Interview Summaries, February 2020 - March 2020 |
| JX22 | Rebel Ice Cream Market Study Summary of Findings |
| JX24 | Rebel Ice Cream Pints 1 |
| JX30 | Instagram post by iceydesignagency |
| PX001 | Email from L. O'Neill to B. Van Leeuwen re Fwd: VEGAN order |
| PX006 | Email from S. Aleksic to G. McDonald, L. O'Neill, B. Van Leeuwen, J. Han, L. Marquez re Next meeting \| Review point-of-purchase |
| PX007 | Presentation re Van Leeuwen Package Design Presentation 3 |
| PX013 | Document re Van Leeuwen Brand Guidelines |
| PX015 | "Artisanal Ice Cream Gets The Pentagram Treatment," www.fastcompany.com |
| PX016 | "A Brooklyn ice cream brand increased sales by 50% after it redesigned its packaging," A. Quito, Quartz |
| PX017 | "Van Leeuwen Artisan Ice Cream rebrand, by Natasha Jen," S. Dawood, Design Week |
| PX021 | "25 Ice Cream Packaging Designs," N. Mouradian, Dieline |
| PX025 | "Van Leeuwen Ice Cream Packaging and Branding," Ateriet |
| PX033 | Email from A. Archibald to C. Cogliandro re FW: Rebel Ice Cream |
| PX036 | Email from K. Grubka to A. Archibald re Meeting Notification with Publix Super Markets Inc. with attachment Spreadsheet re New item spread sheet |
| PX038 | Email from K. Chen to P. Van Leeuwen, L. O'Neill, B. Van Leeuwen, S. Rodsky re Fwd: NOSH UL presentation with attachment Prsentation re Category strategy from Unilever |

| Exhibit | Description |
|---|---|
| PX040 | Email from B. Conkey to A. Wright, M. Bauman, K. Pedriana re Van Leeuwen - Introduction! with attachment photograph |
| PX042 | Presentation re Sprouts Farmers Market, Van Leeuwen Ice Cream & Vegan Ice Cream |
| PX056 | Presentation re Part 1: November & Year End Marketing Meeting |
| PX059 | Email from A. Archibald to T. DeMinico |
| PX061 | Presentation re Rebel Creative Treatment |
| PX062 | Email from A. Archibald to T. DeMinico re Rebel \| Parthenon Discussion |
| PX067 | Email from E. Minn to A. Archibald, T. DeMinico, M. Gilbert. C. Archibald, et al. re EY-Parthenon/Rebel Ice Cream - Week 1 update |
| PX069 | Memo from EY-Parthenon to Rebel Creamery re Project Chip - Week 1 Update |
| PX073 | Presentation re Rebel Ice Cream Market Study Summary of Findings |
| PX074 | Email from E. Minn to L. Kiely, A. Archibald, C. Archibald, T. DeMinico, et al. re EY-Parthenon \|\| Rebel Interim Update with attachment Presentation re Rebel Ice Cream Market Study Summary of Findings |
| PX080 | Email from T. DeMinico to A. Archibald, C. Archibald, Deal Team re Rebel ELD and Parthenon Comments with attachments Presentation re Rebel Creamery, Disrupting the Ice Cream Category; Document re Rebel Ice Cream Commercial Sell Side Due Diligence |
| PX093 | Email from A. Archibald to T. DeMinico, Deal Team re Rebel ELD and Teaser |
| PX112 | Screenshot of Van Leeuwen Ice Cream tagged Instagram Posts |
| PX118 | Email from L. Domaas to A. Wright, K. Baldasaro re Buyer email? |
| PX121 | Email from H. King to A. Archibald, Deal Team, R. Freeman re IRI Panel Data |
| PX130 | Presentation re Rebel Confidential Information Memorandum |
| PX132 | Presentation re Ice Cream Analysis |
| PX157 | Presentation re Van Leeuwen Q2 2021 Board Meeting |
| PX160 | Document re Van Leeuwen 2021 Media Investment Flowchart |
| PX164 | Screenshot of Instagram post |
| PX171 | Document re Van Leeuwen Instagram Feed |
| PX172 | "Van Leeuwen Artisan Ice Cream, Identity and Packaging Design," www.behance.net |
| PX174 | Screenshot of Amazon search re Van Leeuwen Ice Cream |
| PX176 | Presentation re Van Leeuwen Q4 2021/2022 Budget Board Meeting |

| Exhibit | Description |
|---|---|
| PX177 | Spreadsheet re Instacart All Keywords Aggregated Lifetime |
| PX182 | Screenshot of Van Leeuwen Ice Cream website, Good Stuff - Our Story page |
| PX191 | Photograph of ice cream freezer display |
| PX192 | Photograph of Pentagram meeting |
| PX193 | Document re Large Account 2021 P&L: Shaws |
| PX194 | Photograph of ice cream freezer display |
| PX196 | Photograph of ice cream freezer display |
| PX205 | Sreenshot of Google search for "ice cream pint design trends" |
| PX210 | Screenshot of Google search for "ice cream packaging" |
| PX212 | Screenshot of Google search re "popular ice cream packaging" |
| PX214 | Photograph of ice cream freezer display |
| PX218 | Photograph of ice cream freezer display |
| PX233 | Keegan Report Exhibit 6 |
| PX236 | Courtney Archibald Pinterest Profile |
| PX238 | Photograph of ice cream freezer display |
| PX240 | Photograph of ice cream freezer display |
| PX241 | Photograph of ice cream freezer display |
| PX243 | Photograph of ice cream freezer display |
| PX244 | Photograph of ice cream freezer display |
| PX245 | Photograph of ice cream freezer display |
| PX246 | Photograph of ice cream freezer display |
| PX247 | Photograph of ice cream freezer display |
| PX248 | Instagram post video by dkurien |
| PX249 | VLIC Historical Financial Data (updated 2024) |
| PX251 | 2024 Marketing Budget |
| PX252 | List of Grocery Stores Selling Van Leeuwen Ice Cream Pints |

## PRELIMINARY STATEMENT

In 2016, Plaintiff Van Leeuwen launched the Van Leeuwen Trade Dress for its dairy ice cream pints to great fanfare from the ice cream industry and the design industry more generally. Almost instantly, and to this day, the Van Leeuwen Trade Dress is recognized as norm-breaking, and it is uniquely associated with Van Leeuwen's brand. So much so that when Rebel launched its dairy pints with the same design elements, **four retail buyers** immediately associated Rebel's packaging with Van Leeuwen's. Not Jeni's, not Eclipse, not any other "minimalist" ice cream brand. Van Leeuwen. One buyer summarized Lanham Act infringement in one sentence: **Rebel** "**live[s] in that great space of 'Hey. Is this Van Leeuwen out of Brooklyn**….?" JX17 at '1355-1356. Consumers surveyed explained, in their own words, that they believed there was an affiliation between Van Leeuwen and Rebel because the packaging was "identical." Stockers mix the two brands up on the freezer shelves where they reside, often side-by-side.

The evidence that the Van Leeuwen Trade Dress is distinctive, and that Rebel's strikingly similar design causes confusion under the Lanham Act is undeniable. Yet Rebel willfully ignored it and denies it to this day. A Wegman's buyer called the Van Leeuwen Trade Dress to Rebel's attention **before Rebel launched**. In response, Rebel's CEO didn't marvel with his co-designer at the coincidence of another brand with a strikingly similar design. He didn't even mention it. In sharp contrast to **everyone else** who has seen the two brands, Rebel willfully ignored it. Rebel launched its trade dress and has deliberately and successfully used it to compete with premium ice cream brands including, explicitly, Van Leeuwen.

Rebel's use of the Van Leeuwen Trade Dress has unjustly enriched Rebel at Van Leeuwen's expense. The Lanham Act exists to prevent this, and Van Leeuwen will establish entitlement to relief at trial.

## PROPOSED FINDINGS OF FACT

### I. Van Leeuwen Designs the "Norm-Breaking" Van Leeuwen Trade Dress

1. In 2008, brothers Ben and Pete Van Leeuwen and Laura O'Neill began selling premium dairy ice cream out of a pastel-yellow ice cream truck in New York City. Their mission: "To make good ice cream that makes you feel good. Because a life without anything good is bad." *E.g.*, PX182. Van Leeuwen prioritized high quality, simple ingredients. *Id.*

2. Van Leeuwen expanded to sell ice cream in "scoop shops", online, and in retail stores. Ex. 1 at 188:19-189:6; 230:3-5, 225:12-226:5, PX252 (grocery store addresses).

3. In January 2015, Van Leeuwen decided to refresh its ice cream pint packaging. JX12. Current packaging "didn't reflect the overall brand that [Van Leeuwen] had created." Ex. 1 at 31:19-24. "[T]he landscape of the ice cream packaging [was] crowded and chaotic" and it was "difficult to locate Van Leeuwen ice cream amongst the noise." JX3 at '38288-29 (Pentagram Presentation 1); Ex. 1 at 64:15-65:20.

4. Van Leeuwen understood packaging was "incredibly important" to selling ice cream. Ex. 1 at 44:4-6; PX1 ("She's not ordering classics coz she doesn't like our new packaging."). The goal of the redesign was to "sell more ice cream, build a brand" and "go national." Ex. 1 at 241:8-244:3. Van Leeuwen's priorities were "standing out in the freezer," DX1007, and conveying "[a] classically formulated, high quality product with pure and simple ingredients." Ex. 1 at 31:25-32:6.

5. Van Leeuwen engaged world-renowned agency Pentagram and their award-winning designer Natasha Jen, to help redesign its packaging. JX1 (Pentagram Proposal).

6. Pentagram and Van Leeuwen worked together over months to design packaging that would increase Van Leeuwen's visibility in the industry and make it stand out on retail shelves. They conducted industry research and went to supermarkets to see Van Leeuwen in its "natural,

consumer environment alongside competitors." PX6 at '39073; DX1006 (Pentagram 11/30/2015 Presentation) at '3757-3763 (competitor packaging). They spent "hours and hours in supermarkets, just staring at the doors" to see what would "visually pop." Ex. 1 at 243:4-13.

7. Pentagram developed seven prototypes, which Van Leeuwen narrowed to four options before reaching a final decision. *E.g.*, JX3; JX4; PX7; PX192.

8. Van Leeuwen chose the Van Leeuwen Trade Dress, JX5, containing four design elements: (1) cardboard monochromatic pints with matching monochromatic lids; (2) primarily pastel color palette and/or pastel tinted hues; (3) black script typeface lettering with an exaggerated capital letter appearing across the front of the ice cream pint with additional descriptive writing in black lettering; and (4) an overall minimalistic design aesthetic. Compl. ¶¶ 26, 28.



9. In August 2016, Van Leeuwen launched the Van Leeuwen Trade Dress. PX171.

10. The Van Leeuwen Trade Dress was part of a brand redesign that included Van Leeuwen's brick-and-mortar stores and complementary (but deliberately distinct) packaging for its vegan products. JX3; PX13 (Van Leeuwen brand entity guidelines).

11. The redesign worked. After launch, Van Leeuwen's year-over-year growth rate increased from 35.8% average to 91.6%. DX1025 at 7-8.

12. The Van Leeuwen Trade Dress was promptly and widely recognized as breaking "norms" in ice cream. PX38 at '141 (Unilever presentation). It became quickly and closely associated with Van Leeuwen and set Van Leeuwen apart from competitors:

- Fast Company, March 30, 2017: "**Van Leeuwen's new identity . . . makes the brand stand out by stripping down its visuals**. On shelves full of pints with old-fashioned typography, cutesy illustrations and general visual clutter, Van Leeuwen's cheery pastels and clean type are eye-catching in their simplicity." PX15.[1]

- Quartz, March 30, 2017: "A curious thing happened when high-end ice cream brand Van Leeuwen redesigned their packaging: People began snapping pictures of supermarket freezers. '**Didn't even crave for ice cream but just because of the cute packaging**,' wrote a customer who shelled out almost $20 for a pink pint of strawberry and an amber-colored container of salted caramel. . . . **Redesigning packaging so it 'looks good on social media,' is a deliberate strategy.**" PX16.

- Design Week, April 3, 2017: "The new look is made up of an italic logotype and series of block colours to represent different flavours—'minimal graphics', says Pentagram, which aim to '**stand out in store and look great on social media**." PX17.

- Dieline, June 20, 2017: Featuring Van Leeuwen as part of "25 Ice Cream Packaging Designs." PX21.

- Behance, June 23, 2017: "Stripping off all the visual noise typically seen in ice cream branding, **the new identity** . . . **reflects the purity of the ingredients, and color pints that stand out in stores and look great on social media**." PX172.

- Ateriet, September 1, 2017: "**With a minimalistic design and great colors, the new look stands out** and [has] caught the attention of both packaging nerds and consumers." PX25.

13. To this day, the Van Leeuwen Trade Dress receives media attention recognizing its innovation. In July 2024, an Instagram post featured Van Leeuwen as an example of "how to make your brand stand out," praised Van Leeuwen's "use of negative space," and noted "in a category

[1] All emphasis in this brief is added.

where everyone else is trying to shout, be bold and whisper." PX248 (D. Kurien Instagram). Design agencies continue to recognize the significance of the Van Leeuwen Trade Dress in packaging design trends. JX30 (Icey Design Agency Instagram post).

14. Van Leeuwen's packaging features prominently in its social media and advertising, and Van Leeuwen has invested in advertising the trade dress. *See, e.g.*, PX42 (Presentation to Grocery Store Sprouts) at '36731 (highlighting consumer appeal of "Instagrammable" packaging and "photogenic treats");[2] Ex. 1 at 227:20-228:18; DX1031 (ROG 10); PX56 (2019 November & Year End Marketing Meeting); PX160 (2021 Media Investment Flowchart); PX176 at '5774 (2022 Marketing Budget); PX251 (2024 Marketing Budget); PX249 (advertising spend 2014 – 2023); *see also* Dkt. 1-4, 1-5 (Exhibit D to Complaint featuring Van Leeuwen Instagram).

15. Van Leeuwen advertises its trade dress online and in brick-and-mortar scoop shops. Ex. 1 at 226:14-228:18.

16. Since Van Leeuwen launched the Van Leeuwen Trade Dress,[3] other ice cream manufacturers have embraced "minimalist" trends and designed packaging that uses one or two elements of the Van Leeuwen Trade Dress in some manner. But **none** of these many designs uses **all** of the Van Leeuwen Trade Dress elements to create an overall impression that is confusingly similar to Van Leeuwen. *See* DX1009–DX1018; DX1058–DX1085, DX1088–DX1092.

[2] PX42 is representative of all Van Leeuwen presentations to grocery store buyers.
[3] The other ice cream manufacturers Rebel identified launched their packaging later than the August 2016 launch of the Van Leeuwen Trade Dress: Jeni's (2017); Skinny Cow (2017); Bridgeman's (2017); Cado (2017); Artic Zero (2018); Eclipse (2019); Ripple (2020); Normal (2021); Wildgood (2021); Fronen (2022); Boba (2022); Craig's (2023). The only ice cream manufacturer Rebel identifies that predates the Van Leeuwen Trade Dress is Morgenstern's, which does not look anything like Van Leeuwen.










17. Van Leeuwen's founders will testify that they have not redone Van Leeuwen's dairy packaging because of the strength of its existing design.

18. <u>**All**</u> of Van Leeuwen's classic dairy ice cream pints since the launch in 2016 bear the Van Leeuwen Trade Dress.[4]

## II. Rebel Knowingly Launches Packaging that Infringes the Van Leeuwen Trade Dress

19. Austin Archibald founded Rebel Creamery, LLC in September 2017. Ex. 2 (Rebel 30(b)(6)) at 26:25-27:2; 29:21-30:6; 31:21-23.

20. Rebel's packaging adopts the exact unique combination of elements that make up the Van Leeuwen Trade Dress. *See* JX14 (Rebel Instagram announcing packaging).

[4] Van Leeuwen has a separate line of vegan pints that bear a different but complementary trade dress. PX157 at '4756. In 2021, Van Leeuwen changed its **vegan** line to align better with the class dairy packaging. *Id.* at '4755-56. Van Leeuwen also has a separate line of "Limited Edition" pints, so designated on the face of the package. These pints are sold in limited circulation—usually for 1-2 months in Walmart or scoop shops/online. Ex. 1 at 133:2-5, 144:13-20 (describing "limited distribution, available seasonally"). The Limited Edition packaging is complementary to but distinct from the Van Leeuwen Trade Dress. DX1019; Ex. 1 at 246:16-20 (Limited Edition pints are "changed from the traditional Van Leeuwen trade dress"). Van Leeuwen is not seeking trade dress protection for these separate lines in this case. DX1031 (ROG 7) at 8.




21. There is not a single document regarding how Rebel designed its trade dress.

22. Austin Archibald says he and his wife Courtney Archibald "went to our local grocery store and … well, several local grocery stores, and just looked at the shelves...." Ex. 2 at 38:13-21. Courtney said the opposite: that she "rarely step[ped] foot inside a grocery store" and that grocery stores "was not where the inspiration was coming from at all." Ex. 3 (C. Archibald Tr.) at 15:7-15.

23. Archibald testified that he only "googl[ed]" "sugar-free ice cream or low sugar ice cream, things like that[.]" Ex. 2 at 39:11-40:11. Archibald claims it would be a "very long and deep rabbit hole" to look at ice cream packaging more generally. *Id.* at 43:6-13. Archibald claimed **he** performed all the google searches because his wife is "not as technically minded." *Id.* at 41:20-42:2. Courtney volunteered that she learned about design trends "on social media," like "Instagram." Ex. 3 at 11:14-12:18. Courtney's Pinterest account reveals over 50 immaculately curated "pinterest boards," which Courtney admitted she created using internet "search[es]" before backpedaling: "Online research is not really my forté." Ex. 3 at 20:5-25; 21:7-17; PX236 (C. Archibald Pinterest).

24. When asked what research Rebel did, Archibald —a graduate of Harvard Business

School with expertise in market research and due diligence, Ex. 2 at 26:25-27:4; 29:21-30:6—volunteered defensively: "**Did not read any reports or anything like that"** and claimed research was limited to looking at better-for-you ice cream—"that's all we studied." *Id.* at 40:7-11. But Rebel's **Answer** states that Rebel "conducted research to understand trends for packaging" and cites as an "instance" an article an entitled "10 Creative Packaging Design Trends for 2018." Dkt. 27 ¶ 10.

25. Rebel's story is implausible and internally inconsistent.

26. In 2017, basic searches such as "ice cream packaging" or "popular ice cream packaging" or "ice cream pint design trends," would have revealed Van Leeuwen's packaging. *See* PX205, PX210, PX212 (search results); *see also supra* ¶ 12.

27. Rebel admits it learned of the Van Leeuwen Trade Dress in July 2018, **before Rebel launched**. The Wegman's ice cream buyer noted "similarities in the packaging with Van Leeuwen" during a meeting where Archibald was pitching Rebel. Ex. 2 at 13:6-14.

28. Archibald never mentioned the existence of the Van Leeuwen Trade Dress or the incident with Wegmans to his wife Courtney—the person who supposedly came up with the design. Ex. 2 at 13:6-14; 29:6-20; Ex. 3 at 22:13-19. He did not read the articles about Van Leeuwen's innovative packaging. Ex. 2 at 29:6-20.

29. With knowledge of the Van Leeuwen Trade Dress, Rebel entered the highly competitive market for ice cream freezer space using the Van Leeuwen Trade Dress. Ex. 2 at 15:24-16:20.

## III. Rebel's Packaging Enables Rebel to Compete with Premium Ice Cream Brands—Including Van Leeuwen

30. Packaging is vital in the ice cream industry generally and to Rebel's success specifically. Archibald could not recall any meeting with a buyer that did not require packaging.

Ex. 2 at 73:1-74:7; 77:9-16 (Wegman's required); PX33 at '38920; PX36 (Publix required "live packaging samples"). Archibald understood that "a consumer may only be looking at ice cream for a couple of seconds" so packaging "is important." Ex. 2 at 39:5-10.

31. Outside litigation, Rebel identifies its packaging as a key strength. In November 2019, Rebel hired investment bank Harris Williams to help explore a partial sale of the company. Ex. 2 at 60:15-22. Harris Williams touted to potential investors that Rebel's "super-premium packaging" "connotes super-premium positioning with broad appeal, **often placing Rebel on shelves next to indulgent, not better-for-you, brands**." PX130 at '5631.

32. Rebel hired Ernst Young-Parthenon (EYP) to conduct an analysis of Rebel's brand. PX62 (2/13/2020 emails); JX16 (EYP Statement of Work). Rebel directed EYP to interview retail buyers, distributors, and competitors in connection with the brand study—and provided a list of buyers. Ex. 2 at 98:9-21; PX67 (Archibald email). The EYP study established the centrality of packaging to Rebel's ability to compete with premium ice cream brands like Van Leeuwen:

- "Rebel's simple, refined packaging more closely resembles super-premium non-BFY [better for you]." JX22 at '10060.
- "Their product stands on the shelf in a way that's more towards the premium pint area, and that's a good place to be. **They live in that great space like Van Leeuwen** – until you pick it up you don't realize it's an alternative [to traditional ice cream]." JX22 at '10060.
- "I think what [Rebel] did with their packaging kind of allows them to differentiate. **So if I'm going in looking to buy regular Ben & Jerry's or Van Leeuwen, then I see this and go, 'Oh, what is it? Let me look**.'" JX17 at '1359.

33. Rebel takes market share from "premium" ice cream brands like (and explicitly including) Van Leeuwen. *See* PX80 at '9951, 9953 (identifying premium product positioning); PX132 at '512 (listing Van Leeuwen as competitor); PX121 at '1156 (Van Leeuwen in Rebel's "category"); JX22 at '10060 ("[B]rands like Rebel will be next to other premium brands like

Haagen-Dazs and Ben & Jerry's.")

34. Rebel's agent explained, "an indulgent consumer" may "alternate between a Rebel and a [Ben & Jerry's]" ice cream. PX59; PX69 at '8877 (Rebel branding study placing it in the "super premium" ice cream category).

35. Outside litigation, Archibald agreed, touting that Rebel "ice cream is not just for dieters," PX61 at '7557, and that "**57%**" **of Rebel's customers "bought traditional ice cream before being a Rebel consumer**." PX93.

36. In late 2020, Rebel zeroed in on advertising to the "mainstream crowd," *i.e.* not just dieters or individuals with nutritional restrictions. PX93.

37. Rebel paid for consumers to be directed to **Rebel** when they search Instacart or Amazon for **Van Leeuwen**. PX177 (Instacart); PX174 (Amazon); Ex. 2 at 161:17-162:1 (Instacart keywords).

38. EYP included Van Leeuwen as a competitor in draft presentations of the brand study shared with Rebel. But **after** Austin Archibald reviewed the presentation, Van Leeuwen was scrubbed from the presentation. *Compare* PX73 at '3814 ("useful to show rebel in the middle of van leeuwen and another BFY that is busy and less 'streamlined'") *and* PX74 at '8846 (image of Van Leeuwen packaging) *with* JX22 at '10060 (removing image of Van Leeuwen packaging); Ex. 2 at 106:11-107:4, 132:11-133:1 (admitting review but disclaiming involvement in the decision to remove Van Leeuwen).

## IV. Rebel's Packaging Causes Confusion and Harms Van Leeuwen

39. Van Leeuwen first heard of Rebel in or around January 2019, including from a broker who wrote of Rebel: "[W]e are doing our best not to sit on the same shelf with the packaging being similar." PX40; Ex. 4 (ROG 14 ¶ 2); DX1031 (ROG 16).

40. Van Leeuwen was alarmed, but remained hopeful that Rebel—as a "better for you"

ice cream that was antithetical to Van Leeuwen's ethos—would not harm Van Leeuwen. *See* DX1047 (October 2019 email from B. Van Leeuwen sending picture of Rebel on shelves among "better for you" ice creams asking "can we sue[?]"); JX17 at '1259 (Van Leeuwen COO stating that Van Leeuwen does not view itself "in the same category" as better for you ice creams).

41. Van Leeuwen was wrong to think Rebel might not affect it or cause confusion.

42. Grocery stores routinely stock Rebel and Van Leeuwen side-by-side on shelves. Ex. 4 (ROG 14 ¶ 10); PX40, PX112 (Instagram of freezers); PX164 (KCF Coop Instagram); PX194 (Walmart in Austin, TX); PX196 (Citarella, East Hampton, NY); PX214 (Tom Thumb, Fort Worth, TX); PX218 (Citarella, East Hampton, NY); PX191, PX241, (Lassens, Los Angeles, California); PX243 (Walmart, Burbank, CA).

43. Rebel and Van Leeuwen pints are the same price. *E.g.*, PX214 ($4.99/each); DX1031 (ROG 8) (Van Leeuwen average retail price from 2019-present $6.99/pint); JX24 (Rebel retail price $6.49/pint).

44. In September 2020, Dan Blanchard, a buyer for Publix told Van Leeuwen's Executive Vice President/General Manager, Alexandra Wright: "Your packaging looks a lot like Rebel Creamery's. I don't know who came out with it first, but it could be confusing to customers." Ex. 4 (ROG 14 ¶ 3).

45. After that meeting, Publix—"one of the biggest and most important retailers"—chose not to carry Van Leeuwen. Van Leeuwen believes this was due, at least in part, to "its concerns of having Rebel and Van Leeuwen on the same shelf, or on shelves close to each other." Ex. 1 at 180:15-181:18.

46. Buyers, consumers, and **Rebel's own branding agent** have highlighted the similarity between the Van Leeuwen and Rebel trade dresses.

47. Jim Wright of Center Store told Rebel's agent EYP that Rebel "live[s] in that great space of '**Hey. Is this Van Leeuwen out of Brooklyn** that's just fantastic dairy-milk ice cream'?" JX17 at '1355-1356. EYP responded, "It's funny, because we were looking at Van Leeuwen and Rebel, and noticed that that packaging looked pretty similar." JX17 at '1356.

48. Sophisticated buyers for **three** other grocery stores—Publix, Wegman's, and Nugget—commented to Van Leeuwen or Rebel that Van Leeuwen's and Rebel's packaging looks similar and, in some cases, expressed concern about confusion. *See supra* ¶ 44 (Publix) (noting possibility of confusion); *supra* ¶ 27 (Wegman's); Ex. 4 (ROG 14 ¶ 4) (Nugget).

49. Consumers are also confused.

50. Van Leeuwen's consumer confusion survey shows 34.3% net confusion between Rebel and Van Leeuwen packaging. DX1028 (Keegan Report ¶ 79); Dkt. 78 at 6. Responses to open-ended questions about why survey respondents believed there was an affiliation between Van Leeuwen and Rebel included: "**packaging looks identical**," the pints are "**almost identical**," and "the **only thing that differs are the names** on the containers." PX233 at 2 (survey results).

51. Grocery store stockers (or customers) have intermingled Van Leeuwen and Rebel in apparent confusion. Ex. 4 (ROG 14 ¶ 10); Ex. 1 at 210:10-19; PX196 (Citarella in East Hampton, NY); PX218 (Citarella in East Hampton, NY); PX238 (Walmart in Burbank, CA); PX240 (Walmart in Maryland); PX243, PX 244, PX245, PX247 (Walmart in Burbank, CA); PX246 (City Market in Avon, CO).

52. The confusion has harmed Van Leeuwen reputationally and financially. Ex. 1 at 187:13-17 ("Q. Do you believe that Van Leeuwen has lost sales . . . actually lost sales as a result of Rebel's trade dress? A. Yes."); Ex. 4 (ROG 4, ROG 14, identifying instances of confusion).

53. In addition to Rebel taking market share from Van Leeuwen, *see supra* ¶ 37,

consumers looking for a Van Leeuwen pint may not be able to find it because "stocking associates mix the two products up" or "a new potential customer may confuse Van Leeuwen's ice cream as "another low sugar and/or low fat ice cream, which they may not want." Ex. 1 at 176:6-177:8.

54. Van Leeuwen and its agents expressed concern about stocking near Rebel in Shaws grocery stores and Van Leeuwen sales suffered in that store. PX118 (March 2021: "Oh man-the placement on this might be an issue. Do you know if we are on top shelf above rebel in every store?"); PX193 at 18 (Shaws "placement was terrible").

55. Van Leeuwen initiated this litigation a few months after the Publix meeting and one month after the problematic placement in Shaws to stop the widespread confusion and harm.

## PROPOSED CONCLUSIONS OF LAW

### I. Count I: Trade Dress Infringement (15 U.S.C. § 1125(a)(1)(A))

56. Trade dress infringement under the Lanham Act requires (1) "trade dress is either inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning;" and (2) "likelihood of confusion between defendant's trade dress and plaintiff's." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (emphasis in original).

#### A. The Van Leeuwen Trade Dress Is Inherently Distinctive

57. "[T]rade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful." *Fun-Damental*, 111 F.3d at 1000. Suggestive and arbitrary or fanciful marks are "inherently distinctive." *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 583 (2d Cir. 1993). Descriptive trade dress requires secondary meaning. *Id.*

##### 1. The Van Leeuwen Trade Dress Is Arbitrary/Fanciful (or Suggestive)

58. "Since the choices that a producer has for packaging its products are . . . almost unlimited**, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive**

. . . provided . . . the trade dress is not functional." *Paddington*, 996 F.2d at 583. Even if certain "individual features" are "common" in the ice cream industry, "the impression given by all of them in combination may be inherently distinctive." *Fun-Damental*, 111 F.3d at 1001; *see also Coty, Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 446 (S.D.N.Y. 2017) (packaging arbitrary/fanciful despite individual features being "common in the fragrance industry").

59. The Van Leeuwen Trade Dress is "undeniably arbitrary" because it was selected "from an almost limitless supply of patterns, colors, and designs," *Paddington*, 996 F.2d at 584— including six other proposed designs to capture the Van Leeuwen brand. *Supra* ¶ 7; *see also Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 193 (S.D.N.Y. 2008) (trade dress comprised of (1) mark "printed in lowercase without punctuation;" (2) mark placement "on the top printed line on each product"; (3) "a color scheme of white and metallic gray, with a thin horizontal stripe of color often separating those two colors" is arbitrary).[5]

60. Rebel's attempts to show that elements of the Van Leeuwen Trade Dress are "ubiquitous," Answer (Dkt. 27) ¶ 12; *supra* ¶ 16, **confirm** that the Van Leeuwen Trade Dress is arbitrary— it is one of nearly infinite ways to combine design elements to create a minimalist look. *See Gross*, 641 F. Supp. 2d at 193–94 (courts look to competitors in assessing whether trade dress is arbitrary/fanciful).

61. Rebel's exhaustive examples of brands that used "minimalism" **after** Van Leeuwen launched, *supra* ¶ 16, confirm that a "minimalist" design can use "cartons of various sizes, shapes, and colors and use countless different fonts, symbols, and logos," *Gross*, 641 F. Supp. 2d at 194,

---

[5] At the very least, the Van Leeuwen Trade Dress is "suggestive" of high quality ingredients and thus inherently distinctive. A suggestive trade dress "does not describe the product, its purpose, or its utility but rather requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Majestic Drug Co. v. Olla Beauty Supply, In*c., 1997 WL 37955, at *5 (S.D.N.Y. Jan. 31, 1997). *Supra* ¶¶ 1, 3-4, 12-13.

to create "distinctive" trade dresses that "point to a single source of origin." *Fun-Damental*, 111 F.3d at 1000.

62. That these **many** ice cream brands use elements of the Van Leeuwen Trade Dress but (unlike Rebel) do not use **all** the elements in the same combination to create the same "total impression," confirms that the Van Leeuwen Trade Dress is inherently distinctive and, thus, protectable. *Supra* ¶¶ 8, 16. *Fun-Damental*, 111 F.3d at 1001 (Factfinder must "evaluate trade dress distinctiveness by looking at all its elements and considering the total impression the trade dress gives to the observer.").[6]

### 2. Van Leeuwen Has Not "Moved Away From" the Van Leeuwen Trade Dress

63. Rebel claims "Van Leeuwen has moved away from its claimed trade dress," and says this undermines "distinctiveness." JPTO (Dkt. 72) at 6. Rebel is wrong as a matter of fact and law. Van Leeuwen's classic dairy ice cream pints all bear the Van Leeuwen Trade Dress and have a "recognizable and consistent overall look" required to protect a line of products. *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000) (adopting Second Circuit law). Rebel does not argue otherwise.

64. Instead, Rebel tries to argue that Van Leeuwen's **separate line** of Limited Edition pints, **which it has not claimed as part of the trade dress**, DX1031 (ROG 7) at 8, is evidence

[6] While it is not necessary to show secondary meaning, the Van Leeuwen Trade Dress has acquired it: (a) **four retail ice cream buyers** immediately associated Rebel's packaging with Van Leeuwen, *supra* ¶¶ 47-48; (b) one buyer referred to Rebel's packaging as in the **Van Leeuwen "space**," *supra* ¶ 47; (c) consumers purchase Van Leeuwen **because of** its packaging, *supra* ¶¶ 11-12. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc*., 696 F.3d 206, 225 (2d Cir. 2012) ("[S]econdary meaning" is acquired when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself."). Van Leeuwen has other evidence of secondary meaning, *Christian Louboutin*, 696 F.3d at 226: (1) "advertising expenditures," *supra* ¶¶ 14-15; (2) "sales successes," *supra* ¶ 11, 14 (PX249 (financial data); (3) "unsolicited media coverage of the product," *supra* ¶ 12; and (4) "attempts to plagiarize the mark" *supra* ¶ 20; *see also Sara Lee Corp. v. Kayser-Roth Corp.*, 1992 WL 436279, at *17 (M.D.N.C. Dec. 1, 1992) (finding secondary meaning where "there has been no other packaging which is similar to the [plaintiff's] L'eggs packaging until the introduction of the [defendant's] Leg Looks package").

that Van Leeuwen is not consistently using its trade dress. Second Circuit law forecloses this argument. When "seeking protection for the trade dress of a line of products, the plaintiff can define the line as it sees fit." *Rose Art*, 235 F.3d at 173. In evaluating consistency, "**a trial court should consider only the products or packaging for which the plaintiff is seeking trade dress protection**." *Id.* at 175; *accord Classic Touch Decor, Inc. v. Michael Aram, Inc.*, 2015 WL 6442394, at *8 (E.D.N.Y. Oct. 23, 2015) (Court "should not consider products that are not at issue.").

**B. The Rebel Trade Dress Causes Confusion**

65. "[T]he Lanham Act protects against numerous types of confusion, including confusion regarding affiliation or sponsorship," "confusion as to source," *International Info. Sys. Sec. Certification Consortium, Inc. v. Security Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016) (citing cases), and "confusion that creates **initial customer interest**, even if no final sale is completed as a result." *Clinique Lab'ys, Inc. v. Dep Corp.*, 945 F. Supp. 547, 551 (S.D.N.Y. 1996).

66. Initial-interest confusion "occurs when potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Coty*, 277 F. Supp. 3d at 441. This confusion is actionable because the infringer's "**ability to gain a foothold in plaintiff's market** by exploiting subliminal or conscious association with" the trade dress "is likely to work to plaintiff's detriment." *Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 486 F. Supp. 414, 428 (S.D.N.Y. 1980). This is **exactly** the phenomenon the Center Stores buyer identified between Rebel and Van Leeuwen. *Supra* ¶¶ 32, 47 (JX17 at '1356, '1359).

67. Factors relevant to establishing likelihood of confusion are set out in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):

(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two

> marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will "bridge the gap" between the two markets; (6) the defendant's good faith in adopting the mark; (7) the quality of the defendant's product; and (8) the sophistication of purchasers.

*Clinique*, 945 F. Supp. at 551. Any doubts about the likelihood of confusion should be "resolved in favor of the senior user"—Van Leeuwen. *Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*, 899 F. Supp. 1204, 1209 (S.D.N.Y. 1995).

### 1. Strength of the Mark

68. Strength of the mark is measured by "tendency of the trade dress to identify the goods sold as emanating from a particular source." *Fun-Damental*, 111 F.3d at 1003 (cleaned up).

69. The Van Leeuwen Trade Dress is a strong mark. (a) Industry members recognize Van Leeuwen's packaging was "norm"-breaking, and one retail buyer identified Rebel as in the "**Van Leeuwen space**." *Supra* ¶¶ 12, 32, 44-48. (b) Van Leeuwen decided not to redo its packaging after seven years because of the strong association between the existing trade dress and the Van Leeuwen brand. *Supra* ¶ 17. (c) Even in 2024, Van Leeuwen receives critical acclaim for its packaging. *Supra* ¶¶13.

### 2. Similarity Between the Two Marks

70. Similarity "turns on the . . . overall commercial impression under the totality of the circumstances." *Coty*, 277 F. Supp. 3d at 446. The test is not whether the two products are identical, but "whether the trade dresses create the same general overall impression." *Gross*, 641 F. Supp. 2d at 194.

71. Courts assess similarity not in a vacuum but rather in the "actual marketplace." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1541 (11th Cir. 1986). *AmBrit* explained the ice cream marketplace as follows:

> **Ice cream novelties are impulse items stored in frosty freezer cases and sold in busy grocery stores to hurried shoppers**. When viewed in this context, **the**

**general similarity of the design of the trade dress of the two products is an even stronger indication of the existence of likelihood of confusion**.

72. The Van Leeuwen Trade Dress and Rebel's packaging undeniably create the "same general overall impression": (a) Consumers comment on the "identical" packaging. *Supra* ¶ 50. (b) Sophisticated retail buyers, and **Rebel's own branding experts** commented on the similarity of these two trade dresses (and **no others**) including identifying possible confusion and the fact that consumers look at Rebel and think "**Hey, is that Van Leeuwen**." *Supra* ¶¶ 32, 39, 44-48; (c) Grocery stores stock the pints side-by-side or intermingle them. *Supra* ¶¶ 42, 51.

### 3. Proximity of the Products

73. Proximity "addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro, Inc. v. Lanard Toys*, Ltd., 858 F.2d 70, 77 (2d Cir. 1988). Factors include (1) "channels" (2) "manner of advertising," (3) "class of consumers," (4) "extent to which the goods or services fall within the same class or are used together." *Clinique*, 945 F. Supp. at 553. Van Leeuwen and Rebel are proximate.

74. <u>Same Channels of Distribution</u>: Rebel and Van Leeuwen sell their pints to the same channels of distribution—ice cream freezers in retail stores. *Supra* ¶¶ 32-35, 42, 51. Rebel is often placed **"on shelves next to indulgent, *not better-for-you*, brands**." *Supra* ¶ 31.

75. <u>Same Advertising</u>: Rebel paid to have Rebel's ice cream displayed to customers who search for "Van Leeuwen" on grocery websites Instacart and Amazon. *Supra* ¶ 37. Rebel advertises to the "mainstream crowd." *Supra* ¶ 36. Both advertise on social media. *Supra* ¶¶ 12, 14-15, 20 (JX14).

76. <u>Same Customers/Class of Goods</u>: Though Rebel is a "keto" ice cream, it has deliberately and successfully used its packaging to compete with and take market share from indulgent ice creams. *Supra* ¶¶ 31-33. Rebel and Van Leeuwen have the same price point. *Supra*

¶ 43. Indulgent consumers—*i.e.* **Van Leeuwen's** customer base—alternate between a Rebel low-sugar ice cream and indulgent ice cream. *Supra* ¶¶ 34-36.

**4. Bridging the Gap**

77. Because Van Leeuwen and Rebel's "products are already in competitive proximity," there "is no gap to bridge, and this factor is irrelevant." *Solid 21, Inc. v. Richemont N. Am., Inc.*, 2023 WL 3996530, at *6 (S.D.N.Y. June 14, 2023). To the extent Rebel claims it is in geographic areas that Van Leeuwen is not, this factor favors Van Leeuwen, which continues its efforts to expand its retail footprint, *supra* ¶ 2. *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 45 (2d Cir. 2016) ("[T]he senior user can undercut the force of the junior user's argument by showing a likelihood that it will expand geographically or into other areas of commerce so that the likelihood of confusion will increase.").

**5. Actual Confusion**

78. Because "actual confusion is very difficult to prove[,] the [Lanham] Act requires only a likelihood of confusion as to source." *Guthrie*, 826 F.3d at 45. Consumer surveys and anecdotal evidence support actual confusion. *See, e.g.*, *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 531-36 (S.D.N.Y. 2011) (consumer survey); *Fun-Damental*, 111 F.3d at 1003–04 (testimony of "national sales manager" "that some retail customers complained" about defendant's product is evidence of actual confusion); *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 257 F. Supp. 3d 611, 615 (S.D.N.Y. 2017) (liability where plaintiff offered a single anecdote about when "a buyer came to plaintiffs' showroom and asked [the witness] whether [plaintiff] had licensed the Velocity mark to [defendant]").

79. The 34.3% net confusion rate of Van Leeuwen's survey, *supra* ¶ 50, is well above the 15% threshold sufficient to show actual confusion in the Second Circuit. *See Capri Sun GmbH*

*v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 171 n.39 (S.D.N.Y. 2022) (collecting cases). The open-ended responses confirm that Rebel's packaging is the source of the confusion.

80. Van Leeuwen's anecdotal evidence shows confusion. (a) Consumers or stockers have mixed up Van Leeuwen and Rebel pints in grocery store freezers. *Supra* ¶ 51. (c) Retail buyers have commented on the likelihood of confusion between the two pints. *Supra* ¶¶ 39, 44-48.

**6. Bad faith**

81. "The second comer has a duty to name and dress its product so as to avoid likelihood of confusion with the senior user's product." *Clinique*, 945 F. Supp. at 555. Bad faith is found when similarities between the two products "are so striking" "it is hard to imagine" how the junior user could have come up with its trade dress without "intentional copying." *Paddington*, 996 F.2d at 587; *accord Clinique*, 945 F. Supp. at 555 ("[T]wo lines of products [are] too similar even to entertain the idea that [defendant] did not mimic [plaintiff's] mark and dress.").

82. Rebel's narrative that it did not see the Van Leeuwen Trade Dress when designing its packaging, *supra* ¶¶ 19-29, is contradictory and implausible. *Guthrie*, 826 F.3d at 44 ("[R]easonable minds might question the likelihood that the person who designed Defendant's marks could have produced a design so nearly identical to Plaintiff's without ever having seen it.").

83. In any event, Rebel's launch after undisputedly learning of the Van Leeuwen Trade Dress in July 2018, *supra* ¶¶ 27, 29, shows bad faith. Archibald's deliberate indifference and Rebel's later attempts to whitewash Van Leeuwen's existence from its presentations, *supra* ¶ 38, are inconsistent with innocent conduct. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 253 (S.D.N.Y. 2,004) ("[B]ad faith finding is reinforced by defendants' testimony at trial that they never saw a Cartier Pasha watch, despite the advertisement on their office wall, and inconsistent positions . . . .").

### 7. Quality of Defendant's Products

84. This factor asks "whether the inferior quality of a junior user's goods could jeopardize the senior user's reputation." *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*, 7 F. Supp. 3d 385, 398 (S.D.N.Y. 2014). Association with Rebel's low-sugar ice cream and ingredients tarnishes Van Leeuwen's reputation as a high quality artisanal ice cream company whose mission is indulgence. *See supra* ¶¶ 1, 4.

### 8. Sophistication of the Buyers

85. "[U]nsophisticated customers . . . are more vulnerable to the confusion, mistake and misassociations against which the trademark law protects." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 220 (2d Cir. 1999), *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003). "Purchasers of relatively inexpensive goods such as ordinary grocery store foods are held to a lesser standard of purchasing care." *Id.* Because "ice cream novelties" are "impulse items" sold to "hurried shoppers." *AmBrit*, 812 F.2d at 1541, *see supra* ¶¶ 4, 30, this lack of sophistication supports likelihood of confusion.

### 9. Balancing *Polaroid* Factors

86. Each of the *Polaroid* factors favors Van Leeuwen—far more than is necessary to establish a likelihood of confusion. *Guthrie*, 826 F.3d at 45 (affirming likelihood of confusion based on "extraordinary similarity of the marks, the proximity of commerce . . . the strength of Plaintiff's mark, and the absence among consumers of sufficient sophistication to protect against confusion" even if "three factors—actual confusion, bridging the gap, and bad faith—favored Defendant"); *Coty*, 277 F. Supp. 3d at 456 (finding likelihood of confusion where "five of the eight factors weigh in [plaintiff's] favor").

## II. Count II: Reverse Confusion Under the Lanham Act (15 U.S.C. § 1114(1))

87. Lanham Act reverse confusion arises "where the consumer will believe that the

junior user is the source of the senior user's goods." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 304 (2d Cir. 2013). Reverse confusion "look[s] to the familiar '*Polaroid* factors.'" *Uber Inc. v. Uber Techs., Inc.,* 521 F. Supp. 3d 455, 463 (S.D.N.Y. 2021). Van Leeuwen is the senior user and Rebel the junior user because Rebel launched after the August 2016 introduction of the Van Leeuwen Trade Dress. *Supra* ¶¶ 9, 27, 29. Reverse confusion is established. *See supra* ¶¶ 65-86.

**III. Count III: Common Law Trade Dress Infringement and Unfair Competition**

88. Rebel committed common law trade dress infringement and unfair competition for the reasons discussed *supra* ¶¶ 56-86. *See Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 448 (S.D.N.Y. 2012) ("[T]he elements of a cause of action for New York common law infringement and for unfair competition mirror the requirements of claims stated under the Lanham Act….").

**IV. Count IV: Dilution (New York General Business Law § 360-l)**

89. "New York law accords protection against dilution to [distinctive] marks." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 280 (S.D.N.Y. 2006). "Dilution can consist of either blurring or tarnishment." *Anthony Vince Nail Spa, Inc. v. Palazzo Nail Spa, Inc.*, 2018 WL 3420013, at *3 (N.D.N.Y. July 13, 2018). Blurring occurs where there "is a likelihood that the capacity of the senior owner's mark to serve as a unique identifier of its source will be diminished." *Id.*

90. Dilution is consistent with, but does not require a finding of, confusion. *Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*, 626 F. Supp. 3d 635, 646 (S.D.N.Y. 2022), *aff'd* 2024 WL 2712636 (2d Cir. May 28, 2024). If there is "substantial similarity of the trade dress used by the parties' [products] in the same marketplace, it is reasonable to infer that there is a likelihood of dilution . . . by blurring." *Anthony Vince*, 2018 WL 3420013 at *4.

91. The substantial similarity between the Van Leeuwen Trade Dress and Rebel's packaging creates a likelihood of blurring by dilution. *Anthony Vince*, 2018 WL 3420013 at *3-4

(copying "all five key elements of the décor style" supported likelihood of dilution by blurring).

## V. Rebel's Good Faith Remote User Affirmative Defense[7]

92. Rebel cannot establish a defense that (1) it "first used the mark in a geographically remote location" where Van Leeuwen was not, and that (2) its "first use of the mark was in good faith." *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 245 (E.D.N.Y. 2009).

93. "**[P]roof of the junior user's knowledge of the senior user's mark at the critical date is sufficient to destroy the 'good faith' element** of the territorial defense." 4 McCarthy on Trademarks and Unfair Competition § 26:9 (5th ed.) (citing cases). Van Leeuwen was all over the internet in 2017 and 2018, and Rebel knew of the Van Leeuwen Trade Dress before Rebel launched from buyers **in the non-remote locations where Rebel was seeking to sell**. *Supra* ¶¶ 12, 14-15, 26-27.

## VI. Relief

94. Under the Lanham Act, Van Leeuwen is entitled to recover injunctive relief and "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. §§ 1116(a), 1117(a). Van Leeuwen's state law claims provide for similar relief. *See Com. Foods, Inc. v. PLC Com. Corp.*, 504 F. Supp. 190, 193 (S.D.N.Y. 1980) ("Under New York law, . . . an injunction may issue against confusingly similar trade dress, even if no secondary meaning is shown."); N.Y. Gen. Bus. Law § 360-I (allowing for "injunctive relief" on dilution claims).

### A. Permanent Injunction

95. A permanent injunction requires (1) "success on the merits" and (2) "irreparable

[7] Rebel asserts two declaratory judgment counterclaims "that essentially mirror Van Leeuwen's affirmative claims." JPTO (Dkt. 72) at 7. Rebel's counterclaims fail for the reasons that Van Leeuwen will prevail on its affirmative claims.

harm." *Coty*, 277 F. Supp. 3d at 463.

96. Van Leeuwen has demonstrated (1) success on the merits, *supra* ¶¶ 56-91, and (2) "irreparable injury" based on "likelihood of consumer confusion," *supra* ¶¶ 65-86. *Coty*, 227 F. Supp. 3d at 463-64.

97. Rebel is enjoined from continuing to sell ice cream pints bearing the infringing Rebel Trade Dress and from using any trade dress in the future that is confusingly similar to the Van Leeuwen Trade Dress. JPTO (Dkt. 72) at 7; *Diageo*, 626 F. Supp. 3d at 656 & n.2.

**B. Accounting of Profits**

98. An accounting of Rebel's profits is warranted to compensate Van Leeuwen for the harm from "diverted sales and injured reputation," *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539 (2d Cir. 1992) (overturned on other grounds), "to avoid unjust enrichment" and "deter infringement." *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 212 (2d Cir. 2019).

99. Van Leeuwen has been harmed in its efforts to expand its retail footprint, harmed in its reputation, and harmed in its sales.

100. Disgorgement remedies require neither actual confusion nor willfulness. *4 Pillar,* 933 F.3d at 212; *Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 218-19 (2020). But both are present here. *Supra* ¶¶ 19-29, 81-83.

101. Each of "the equities weigh in favor of an accounting" and supports awarding Van Leeuwen those profits. *George Basch Co.*, 968 F.2d at 1540 (listing equitable factors).

102. <u>Certainty</u>: Rebel's infringing packaging caused its success, particularly its ability to compete with premium brands like Van Leeuwen. *Supra* ¶¶ 30-38.

103. <u>Adequacy of remedies</u>: An accounting is necessary to deter Rebel's willful infringement and prevent its unjust enrichment. Rebel knew of and ignored Van Leeuwen's senior

trade dress, then used that trade dress to take market share from Van Leeuwen. *Supra* ¶¶ 19-38, 41, 52-54.

104. Rebel's Role: Rebel is solely responsible for its infringement. *Supra* ¶¶ 19-29.

105. Laches: Rebel did not plead laches as an affirmative defense. *See* Answer (Dkt. 27). Van Leeuwen filed suit well within New York's six-year statute of limitations and within months after learning that the Rebel Trade Dress was causing real confusion and harm, *supra* ¶¶ 36, 40-55. *Gross*, 641 F. Supp. 2d at 196 ("presumption against laches where the lawsuit was initiated within the applicable statute of limitations."); *Fourth Toro Fam. Ltd. P'ship v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 198 (S.D.N.Y. 2000) ("[L]aches is inapposite where [there is] slow encroachment upon plaintiff's preserve, of increasingly direct competition, and of sudden promotional expansion aimed at exploitation of a market created by plaintiff.").

106. Clean Hands: Van Leeuwen hired Pentagram to design the Van Leeuwen Trade Dress after surveying the market. *Supra* ¶¶ 5-10. Van Leeuwen's hands are clean.

107. Packaging was a major, not de minimis, contributor to Rebel's profits. *Supra* ¶¶ 30-38.

108. An accounting of profits is not a windfall to Van Leeuwen particularly given Rebel's willful infringement. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 659 (S.D.N.Y. 2007) (In the case of willful infringement, courts are particularly reluctant to allow "a dominant competitor . . . to deduct profits due to its own market dominance," because such deduction would undermine deterrence."); *accord Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1222–23 (8th Cir. 1976); *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970) (ordering all profits where Revlon willfully made use of the mark of a smaller competitor even though competitor was not selling the product at that time).

Date: September 27, 2024

Respectfully submitted

SUSMAN GODFREY L.L.P.

/s/ Elisha B. Barron

Elisha B. Barron
Amy B. Gregory
One Manhattan West, 50th Floor
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340
ebarron@susmangodfrey.com
agregory@susmangodfrey.com

Abigail J. Remore
CHIESA SHAHINIAN &
GIANTOMASI PC
11 Times Square, 34th Floor
New York, NY 10036 ajremore@csglaw.com
Tel: (973) 325-2114

*Attorneys for Plaintiff Van Leeuwen Ice Cream*