UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

VAN LEEUWEN ICE CREAM LLC,

                 Plaintiff,           **MEMORANDUM & ORDER**
                                       21-CV-2356(EK)(JRC)
        -against-

REBEL CREAMERY LLC,

                 Defendant.

------------------------------------x

## Table of Contents

I.   Background ........................................ 3

     A.   Van Leeuwen's Early Years........................... 3

     B.   Van Leeuwen's Early Redesigns........................ 4

     C.   The Trade Dress at Issue............................ 5

     D.   The Reception of Van Leeuwen's Redesign............. 6

     E.   Rebel Creamery's Launch............................ 6

     F.   Rebel's Packaging.................................. 7

     G.   Rebel's Claimed First Encounter With Van Leeuwen..... 9

     H.   Van Leeuwen Becomes Aware of Rebel.................. 9

     I.   This Litigation.................................... 10

II.  Discussion ....................................... 11

     A.   Trade Dress Infringement........................... 11

          1.   Van Leeuwen Has Adequately Articulated a
              Consistent Trade Dress......................... 12

              a.   Van Leeuwen Has Defined Its Trade Dress
                  in a Sufficiently Objective and Specific
                  Manner.................................... 12

              b.   Van Leeuwen's Trade Dress Has a Consistent
                  Overall Look.............................. 16

          2.   Van Leeuwen's Trade Dress Is Distinctive....... 20

          3.   Van Leeuwen's Trade Dress Is Non-Functional.... 23

          4.   Van Leeuwen Has Established a Likelihood of
              Confusion...................................... 26

              a.   Strength of the Trade Dress.............. 27

        b.    Degree of Similarity..................... 29

        c.    Competitive Proximity................... 33

        d.    Bridging the Gap........................ 37

        e.    Actual Confusion........................ 37

              i.   Consumer Confusion.................. 38

              ii.  Grocery Store Employees' Confusion... 39

              iii. Survey Evidence..................... 39

        f.    Bad Faith............................... 44

        g.    Product Quality......................... 49

        h.    Consumer Sophistication................. 49

    B.    New York Common Law Trade Dress Infringement and
          Unfair Competition.............................. 51

    C.    New York Trade Dress Dilution..................... 51

        1.    Van Leeuwen's Trade Dress Is Inherently
              Distinctive............................. 52

        2.    Rebel Has Blurred Van Leeuwen's Trade Dress.... 52

    D.    Rebel's "Good Faith Remote User" Defense............ 54

        1.    Rebel Has Not Shown that Its First Use Was in
              an Area Where the Van Leeuwen Trade Dress Was
              Unknown................................. 54

        2.    Rebel Has Not Established that Its First Use
              Was in Good Faith....................... 55

    E.    Remedies......................................... 55

        1.    Injunctive Relief....................... 56

        2.    Accounting of Profits................... 59

        a.    An Accounting Is Appropriate............ 60

        b.    Computation of Costs.................... 61

        c.    Reduction of Profits.................... 63

III. Conclusion ............................................ 64

ERIC KOMITEE, United States District Judge:

        Van Leeuwen Ice Cream LLC sells pints of dairy ice cream in monochrome, pastel cardboard packages with minimalist designs and black cursive script.  Rebel Creamery LLC uses a

2

near-identical color scheme and script on their packaging, with slight design differences to convey dietary information.  Van Leeuwen sued Rebel for trade dress infringement and related claims under federal and New York law.

This Court held a bench trial on Van Leeuwen's claims. The evidence at that trial left no doubt that Rebel infringed and diluted Van Leeuwen's trade dress and did so intentionally. As a result, Rebel will be enjoined from selling the infringing products and required to redesign its packaging to avoid any further infringement.  Rebel will also be required to disgorge its profits from selling infringing pints, all as set out below.

## I.    Background

### A.    Van Leeuwen's Early Years

Ben Van Leeuwen, Pete Van Leeuwen, and Laura O'Neill founded Van Leeuwen Ice Cream in Brooklyn in 2008.  Tr. 31:11-32:17 (Ben Van Leeuwen).  The company began by selling "premium" dairy ice cream out of a pastel-yellow truck.  *Id*.  At the time, it had no pint package.  When the company began to sell in grocery stores, it hired freelance designers to create its original pint package design.  *Id*. at 33:7-17, 33:24-34:4; *see* PX266 (original pint design).  Early on, Van Leeuwen's wholesale business was limited to the New York tri-state area, but it has since expanded.  Tr. 36:4-8, 339:16-40:11 (Pete Van Leeuwen),

3

342:16-43:6.  Van Leeuwen has also since opened its own stores. *Id.* at 36:9-19 (Ben).

**B.    Van Leeuwen's Early Redesigns**

In 2014, Van Leeuwen conducted its first packaging redesign.  *Id.* at 37:13-19; PX267 (2014 package image).  Soon thereafter, the company decided to conduct another redesign.  *See* JX12 (Jan. 6, 2015 email).  The company had not gotten "real traction in wholesale" and believed that a better design might change that.  Tr. 39:14-40:1-2; *see* PX001 (May 20, 2015 email).  The company hoped the second redesign would increase tri-state area sales, increase wholesale volume, help the company "go national," and "create a cohesive brand."  Tr. 50:8-16, 183:2-7 (Laura O'Neill); *see* DX1041 (2016 Business Plan).

Van Leeuwen engaged Pentagram, a well-known design agency, for the redesign.  Tr. 42:12-43:9 (Ben), 315:6-23 (Natasha Jen); *see* JX01 (Pentagram Proposal).  The Pentagram team was led by Natasha Jen, a partner at the firm.  Tr. 315:6-10, 318:6-15.  After significant research, Pentagram proposed seven potential designs.  *Id.* at 50:21-51:22 (Ben), 55:2-56:14; *see* JX03.14-42 (Jan. 15, 2016 Pentagram presentation); PX192 (photo of the Van Leeuwen team reviewing mock-up packaging).

4

## C.    The Trade Dress at Issue

The pint container that Van Leeuwen selected from Pentagram's options is the trade dress at issue.  *See* JX05 (Pentagram rendering).  An example is pictured here:



JX10.3 (excerpted).

For purposes of this litigation, Van Leeuwen has defined the trade dress by reference to four "elements": "(a) cardboard monochromatic pints with matching monochromatic lids; (b) use of a primarily pastel color palette and / or pastel tinted hues; (c) black script typeface lettering with an exaggerated capital letter appearing across the front of the ice cream pint with additional descriptive writing in black lettering; and (d) an overall minimalistic design aesthetic." Compl. ¶ 26, ECF No. 1; Tr. 76:2-14.  The company began rolling out the new packaging in August 2016, and all original dairy Van Leeuwen pints displayed the new trade dress in 2017.  *See* Stip. ¶ 1, ECF No. 99; Tr. 64:7-17.

5

**D.    The Reception of Van Leeuwen's Redesign**

Pentagram's redesign was successful.  Van Leeuwen's annual growth rate, which had averaged 35.8% between 2014 and 2016, more than doubled, averaging 91.6% between 2017 and 2018. *Id.* at 710:14-20 (Van Leeuwen profits expert Phillip Brida). *But see id.* at 758:22-59:6 (Rebel profits expert Scott Cragun, arguing that these growth figures were imprecise because they included vegan pints).  Wholesale sales doubled (in absolute terms) between 2016 and 2017.  *See* PX249; Tr. 99:10-19 (Ben), 343:7-12 (Pete).  Distribution expanded significantly: Van Leeuwen's ice cream has been sold in all fifty states since 2021, Tr. 348:25-49:1, and in many more national retailers than before.  *See, e.g., id.* at 368:2-17 (discussing national retailers where both Van Leeuwen and Rebel are sold).

The trial evidence also showed the success of the redesign in establishing a cohesive brand identity.  Design publications, design agencies, and consumer packaged goods professionals opined on the innovative new packaging.  *See, e.g.,* PX017 (Design Week article, Apr. 3, 2017); PX021 (Dieline article, June 20, 2017); PX038.8 (Unilever presentation at NOSH conference); JX30.6 (Icey Design Instagram).

**E.    Rebel Creamery's Launch**

Austin and Courtney Archibald founded Rebel Creamery in Utah in September 2017.  Tr. 406:23-25 (Austin Archibald),

6

486:1-6.  Austin graduated from Harvard Business School the year before.  *Id.* at 405:9-10.  He took a year off while attending HBS to work at the Kickstart Seed Fund, where he performed diligence on companies and studied market trends.  *Id.* at 405:11-16.

Austin had started on a ketogenic ("keto") diet and had become active on online keto forums.  *Id.* at 472:4-73:9.  Keto dieters eat foods low in sugar and high in fat to induce ketosis — which he described as a state in which the body burns fat, rather than sugar or glucose, as its fuel source.  *Id.* at 472:6-17.  Austin noticed two things in the online forums: online keto groups were "getting bigger and bigger," and many adherents missed ice cream.  *Id.* at 474:9-23.  Having already begun making keto ice cream at home, Austin testified, he decided to pursue a commercial keto ice cream business.  *Id.* at 474:24-75:10.

The Archibalds raised initial funding for Rebel via a Kickstarter campaign that did not display any packaging.  *Id.* at 481:4-12, 567:3-24 (Courtney Archibald).

**F.  Rebel's Packaging**

After the Kickstarter campaign, the Archibalds worked to create Rebel's packaging from approximately December 2017 through early 2018.  *Id.* at 497:12-14 (Austin).  Courtney testified that she and Austin "came up with the design of

Rebel's ice cream packaging" together.  *Id.* at 557:9-11.
Neither has "any training" in graphic design.  *Id.* at 501:4-7
(Austin).  They used Adobe Illustrator software to design the
packaging.  Austin Archibald testified that they did not save
"any iterations" of the package design — only the final product.
*Id.* at 497:1-98:25.  Both Archibalds testified that they had
never seen Van Leeuwen ice cream when creating Rebel's
packaging.  *Id.* at 426:5-12, 563:7-10 (Courtney).

   Rebel describes its trade dress as including the word
"Rebel" in black cursive writing on the lid and front of the
pint; a black circle that either states the number of grams of
sugar or net carbs; language around the rim of the lid that
indicates the ice cream is "keto, full fat, lactose free"; and a
pastel-colored background.  *Id.* at 489:18-99:25.  The carton is
shown here:



JX14 (excerpted).

## G.    Rebel's Claimed First Encounter With Van Leeuwen

Austin testified that he first encountered Van Leeuwen in a July 2018 meeting with a Wegmans buyer.  Tr. 425:9-26:12. At that time, Rebel was not in grocery store freezers.  *Id.* at 425:17-21.  The Wegmans buyer requested to see Rebel's packaging before agreeing to stock the ice cream.  *Id.* at 424:21-25:3, 429:1-11.  Upon seeing the packaging, the buyer noted to Austin that it was similar to Van Leeuwen's.  *Id.* at 425:9-16.  Austin made no changes in response.  *Id.* at 421:25-22:2.

Rebel's packaging first appeared in grocery stores in August 2018 at Lassens Natural Food in Los Angeles.  *See* Stip. ¶ 2; Tr. 428:15-17.  The ice cream quickly gained popularity and expanded distribution.  *See* JX22.13 (March 2020 market study noting "rapid growth").[1]  By early 2020, Rebel was sold in Publix, Kroger, Walmart, HEB, Fred Meyer, Safeway, and 7-11, among other retailers nationwide.  *See id.* (corporate timeline).

## H.    Van Leeuwen Becomes Aware of Rebel

Van Leeuwen first encountered Rebel Creamery's product in late 2018 or early 2019.  Tr. 224:21-25 (O'Neill).  A Van Leeuwen employee noticed Rebel on social media and brought it to the founders' attention.  *Id.*  The founders were "shocked

---

[1] Hereinafter, this document is referred to as the "March 2020 EYP Study."

9

because, to us, it looked almost exactly like our packaging." *Id.* at 78:17-19 (Ben).  Despite that reaction, Van Leeuwen did not initiate this lawsuit until April 2021.  *See* Compl.  The company had "had never sued anyone before" and was "incredibly cautious about . . . even calling lawyers because," as Ben Van Leeuwen testified, "we had . . . so little capital to do anything, and . . . didn't understand . . . what it sort of meant to sue somebody" in this context.  Tr. 80:10-16.  As Van Leeuwen saw Rebel gain a foothold in the marketplace, however, it initiated this litigation.  *Id.* at 80:17-81:4.

## I.   This Litigation

Van Leeuwen asserted four causes of action, styling them as follows: (1) false designation of origin, unfair competition, and trade dress infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) reverse confusion in violation of the Lanham Act, 15 U.S.C. § 1114(1); (3) common-law trade dress infringement and unfair competition; and (4) dilution in violation of New York General Business Law ("GBL") § 360-l.  Compl. ¶¶ 35-64.

Van Leeuwen seeks injunctive relief requiring Rebel to repackage its products and an order requiring Rebel to account for and pay over the profits from its infringement.  *See* Pl.'s Post-Trial Brief 21-25, ECF No. 111.  Rebel has counterclaimed, requesting a declaratory judgment that Van Leeuwen does not have

10

a protectable trade dress and that Rebel has not committed trade dress infringement.  *See* Counterclaims ¶¶ 45-51, ECF No. 27.  Rebel also asserts a "good faith, remote user" affirmative defense.  Am. Answer ¶ 72, ECF No. 27.[2]

Discovery closed in September 2022.  *See* Docket Order dated Sept. 22, 2022.  No party moved for summary judgment.  However, Rebel moved to strike Van Leeuwen's jury demand, ECF No. 38, and the Court granted that motion.  Mem. & Order, ECF No. 65.  A bench trial and post-trial briefing followed.  This Order presents the Court's findings of fact and conclusions of law.

## II.  Discussion

### A.   Trade Dress Infringement

Van Leeuwen's primary claim is for trade dress infringement under the Lanham Act.  "A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers."  *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001).[3]  Unregistered packaging design is protectable.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209-10 (2000).

---

[2] ECF No. 27 contains both Rebel's amended answer and its counterclaims, which each possess their own set of paragraph numbers.

[3] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

11

To be protected under the Lanham Act, Van Leeuwen must articulate its claimed trade dress with specificity, *Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 124 (2d Cir. 2025), and the trade dress must — as actually deployed — have a "consistent overall look." *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000). Van Leeuwen must prove three additional elements to demonstrate trade dress infringement under the Lanham Act: that "(1) its product design is distinctive, (2) there is a likelihood of confusion between its product design and that of the defendant, and (3) its product design is not functional." *Cardinal Motors*, 128 F.4th at 121.

1. Van Leeuwen Has Adequately Articulated a <u>Consistent Trade Dress</u>

   a. Van Leeuwen Has Defined Its Trade Dress in a Sufficiently Objective and Specific Manner

The requirement that a plaintiff articulate the components of its claimed trade dress "with precision" puts the market — and a reviewing court — on notice of what the plaintiff seeks to protect. *Id.* at 122-24. "[A] plaintiff may satisfy the articulation requirement even if the components described arguably render the trade dress overbroad, generic, not distinctive, or functional." *Id.* at 125.

Federal law does not protect trade dress that lacks "sufficiently objective identifiers." *Int'l Leisure Prods. v.*

*FUNBOY LLC*, 747 F. App'x 23, 25 (2d Cir. 2018).  The Second Circuit has counseled that "[t]he exact level of precision required will no doubt vary from case to case and [with] the specific trade dress alleged."  *Cardinal Motors*, 128 F.4th at 124.  The "description offered must be sufficiently precise as to some specific combination of components present in the trade dress (such as materials, contours, sizes, designs, patterns, and colors) so as to permit courts and juries to adequately evaluate the underlying claims," *id.* at 124-25, and put competitors on notice.  *Yurman Design, Inc v. PAJ, Inc.*, 262 F.3d 101, 117 (2d Cir. 2001) ("And if a court is unable to identify what types of designs will infringe a trade dress, how is a competitor in the jewelry business to know what *new* designs would be subject to challenge by plaintiff?").

Rebel argues that Van Leeuwen's trade dress consists of "subjective and undefined elements" with no "objective boundar[ies]."  Def.'s Post-Trial Br. 3-4, ECF No. 113.  But there is no requirement that a trade dress be defined perfectly objectively or with algorithmic precision.  Instead, courts focus on whether a trade dress definition is "sufficiently precise" and has "sufficiently objective identifiers."  *E.g.*, *Urb. Intel. Inc. v. Spring Scaffolding LLC*, No. 23-CV-1789, 2024 WL 4350613, at *3 (E.D.N.Y. Sept. 30, 2024); *Int'l Leisure*, 747 F. App'x at 25.

13

Van Leeuwen's trade dress elements are sufficiently objective, and have been described with more than adequate precision to put Rebel on notice of the trade dress it seeks to protect.

*First*, Rebel concedes that Van Leeuwen's first element — "cardboard monochromatic pints with matching monochromatic lids" — is objective.  Compl. ¶ 26; *see* Def.'s Post-Trial Br. 2-4.

*Second*, Van Leeuwen's "primarily pastel" element is adequately specific and objective.  Rebel claims that "primarily pastel" lacks an objective boundary.  *See* Def.'s Post-Trial Br. 3.  But Rebel understood what a pastel color was well enough for its founders to testify that they "cho[se] pastel colors" for their packaging to give the pints a "feminine aesthetic." Tr. 499:2-17 (Austin).  And both Ben Van Leeuwen and Natasha Jen provided sufficient specifics: among other things, pastels are less "saturated" colors that include "more cream."  *Id.* at 122:5-13 (Ben), 326:25-27:4 (Jen).

Rebel's invocation of *Forney Industries v. Daco of Missouri, Inc.*, 835 F.3d 1238 (10th Cir. 2016), does not support a contrary conclusion.  In *Forney*, the Tenth Circuit assessed a package design that "typically" included red and yellow in a certain combination, that "may" have employed yellow at the package border, and that "may" have used black in certain

14

accents "including but not limited to lettering." *Id.* at 1241. Not surprisingly, the court held that the trade dress failed on the distinctiveness ground. *Forney*, 835 F.3d at 1252. Among other things, the use of color in the trade dress at issue there "was not associated with any particular shape, pattern or design," *id.* at 1243, which is not true of Van Leeuwen's use of pastels. Moreover, the analysis there concerned a different legal concept: "distinctiveness is independent" of the specificity requirement that Rebel is arguing here. *Cardinal Motors*, 128 F.4th at 124.

It is perhaps true that the modifier "primarily" could be more specific. But Van Leeuwen's trade dress is more than a combination of colors: color is cited alongside specific elements including typeface, the use of negative space, and the material used. This is appropriate: the articulation requirement is analyzed holistically, not element-by-element. *Id.* at 124-25.

Third, Van Leeuwen's "minimalist design aesthetic" element is sufficiently precise. Rebel cites cases in which elements like "pleasing appearance," "aesthetic proportion," and "artistic combination" were held to be unprotectable. *See Int'l Leisure Prods.*, 747 F. App'x at 25; *Yurman*, 262 F.3d at 117; Def.'s Post-Trial Br. 4. Minimalism is susceptible of objective measurement in this context, however, referring as it does to

the proportion of negative space in a design.  Tr. 324:11-25:11 (speaking to the use of "very few elements").  Indeed, Rebel's counsel deployed the term during trial.  *See, e.g.*, *id.* at 111:16-17 (describing Talenti's ice-cream packaging as using a "minimalist aesthetic").

Finally, in conjunction with minimalism, the Court also finds that Van Leeuwen's "additional descriptive writing" element is sufficiently articulated.  The element, as well as the brand's minimalist goals makes clear that apart from the brand's logo, there should be few other words on the package.

Van Leeuwen has satisfactorily defined its trade dress.[4]

b.    Van Leeuwen's Trade Dress Has a Consistent Overall Look

To be protectable, a "consistent overall look" must prevail across the product line in question.  *Rose Art*, 235 F.3d at 173; *see Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997) (party seeking trade dress protection must demonstrate "that the appearance *of its several products* is sufficiently distinct and unique" (emphasis added)).

---

[4] Rebel also contends that Van Leeuwen articulated these elements slightly differently at various points in litigation.  Def.'s Post-Trial Br. 1; Compl. ¶ 14.  These differences are *de minimis*, and reveal no attempt to redefine the trade dress at issue.  *See, e.g.*, Pl.'s Post-Trial Br. 3.  Van Leeuwen repeated the same four elements of its trade dress during trial. *See, e.g.*, Tr. 76:2-14; 106:25-07:2.

16

The contours of the product line are for its owner to delineate: "a trial court should consider only the products or packaging for which the plaintiff is seeking trade dress protection." *Rose Art*, 235 F.3d at 175; *Classic Touch Décor, Inc. v. Michael Aram, Inc.*, No. 15-CV-453, 2015 WL 6442394, at *8 (E.D.N.Y. Oct. 23, 2015). Here, Van Leeuwen has ascribed the trade dress at issue to its "classic dairy line" — a set that includes thirty-seven flavors, but excludes limited-edition and vegan flavors. DX1054.01-37 (all classic dairy flavors); Tr. 136:5-17 (Ben discussing limited edition); PX013.22 (comparing classic and vegan lines).

Rebel argues that Van Leeuwen has deployed its trade dress inconsistently. But the trial evidence convincingly demonstrated that the classic dairy line bears "a recognizable and consistent overall look" overall, even if there have been some slight variations. *Rose Art*, 235 F.3d at 173. Since 2016, the company has used thirty-seven colors in its classic pints. Rebel points out, and Van Leeuwen acknowledges, that some classic dairy pints — Mint Chip, Black Cherry Chip, Lemon Poppy Seed Muffin, and Raspberry Layer Cake — have been sold in pints that did not use pastel colors. *See* Def.'s Post-Trial Br. 4-5. These non-pastel containers comprised only a small portion of the classic dairy line, and they were not all sold at the same time. *See* DX1054.01-37 (Van Leeuwen classic pints); Tr. 133:19-

17

34:2 (Ben).  One of the non-pastel pints was the product of a "mistake" that was quickly corrected to the original pastel. *Id.* at 131:20-24, 133:25-34:1; *see* DX1054.37 (green Mint Chip Van Leeuwen pint).  And the lemon and raspberry flavors have since been discontinued.  Tr. 133:24-25.

As noted above, Van Leeuwen defined this element as "primarily" pastel, which it surely is; and these modest exceptions do not detract from the "dominant visual elements" of the classic dairy pints — its minimalistic, monochrome look. *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 452 (S.D.N.Y. 2000) (holding that variation in a wine store's wall signs did not detract from its "consistent[]" look because the company's "wall of wine" — its "dominant visual element" — was consistently present); *see also Rose Art*, 235 F.3d at 173 ("In endorsing the 'consistent overall look' standard, however, we do not require that the appearance of the series or line of products or packaging be identical.").[5]

Rebel also points to Van Leeuwen's use of non-pastel and non-monochrome color schemes in its limited-edition flavors. *See* Def.'s Post-Trial Br. 5.  This objection is easily dispensed with: the limited-edition pints are outside the specified

---

[5] Van Leeuwen claims that four pints (including the mistake color) were not pastel, Tr. 133:19-34:2 (Ben), and Rebel claims that there are eight non-pastels.  Rebel's Proposed Findings of Fact ¶ 161, ECF No. 112.  This difference does not change the analysis.

product line.  And the authorities that Rebel cites do not support the conclusion that separate product lines can disrupt the consistent look of the plaintiff's trade dress.  For example, Rebel relies upon *Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762 (S.D.N.Y. 1993).  *See* Def.'s Post-Trial Br. 5.  There, Disney sought trade-dress protection for the VHS packaging of its "Classic Animated Features."  *Walt Disney*, 830 F. Supp. at 763.  The *Walt Disney* court noted *inconsistency* in the studio's own product-line definition: Disney did "not include *Fantasia* . . . in its family of Classic Animated Features for the purpose of this action although Disney concedes that *Fantasia* is a Classic Animated Feature."  *Id.* at 764.  That is the key distinction: Disney was trying to have it both ways in that case, whereas Van Leeuwen has not contradicted itself with respect to the distinction between its classic-dairy and limited-edition product lines.[6]  And beyond Disney's contradictions, there was also much more variation across the product line than in the Van Leeuwen dairy line.

Rebel also argues that the limited-edition line dilutes Van Leeuwen's trade dress.  *See* Def.'s Post-Trial Br. 6-

---

[6] It is also worth noting that *Walt Disney* was decided before the line of cases establishing the right of the party seeking protection to delineate the contours of the product line as it sees fit.  *See, e.g., Landscape Forms*, 113 F.3d at 381 (analyzing the overall look of plaintiff's "claimed trade dress"); *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y. 2009); *Classic Touch*, 2015 WL 6442394, at *8.

7.  Rebel notes that if "a manufacturer chooses to seek trade dress protection for too insignificant a line of products, the manufacturer may pass the 'consistent overall look' test but then founder on distinctiveness or likelihood of confusion." *Id.* at 6 (quoting *Rose Art*, 235 F.3d at 175 n.12).  This may be (in theory), but Rebel has not demonstrated that Van Leeuwen defined the relevant line so narrowly.  *Cf.* Tr. 224:11-18 (Van Leeuwen has not redesigned its classic dairy packaging since 2016); *id.* at 195:8-17, 197:18-19, 199:12-200:22, 203:21-25 (discussing advertising the trade dress); PX183 (website displaying trade dress).

Thus, the Van Leeuwen trade dress has a consistent overall look.

### 2.  Van Leeuwen's Trade Dress Is Distinctive

Trade dress must be distinctive.  Rebel argues that Van Leeuwen's trade dress is not, because it is comprised only of functional or commonly used elements.[7]

Trade dress can be distinctive in two ways: if it is "inherently distinctive," or if it acquires "secondary meaning" — meaning it "has become distinctive of the applicant's goods in commerce."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).  "[T]rade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive,

---

[7] Functionality is addressed separately.  *See infra* Section II.A.3.

20

or arbitrary / fanciful." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997). Trade dress that is suggestive or arbitrary / fanciful will qualify as inherently distinctive. *See Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993). This is often the case: "Since the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive." *Id.* at 583. The distinctiveness of a trade dress is measured holistically. *Fun-Damental*, 111 F.3d at 1001.

Van Leeuwen's trade dress is inherently distinctive. Van Leeuwen selected the elements in question from an unbounded universe of options. To take an obvious example, ice cream packaging need not be monochromatic. *See, e.g.*, DX1006.10 (Ben & Jerry's packaging). And pastel colors make up a relatively small subset of the color wheel. *See* Tr. 326:12-27:7 (Jen). Even the product's cardboard packaging was a choice — Van Leeuwen considered a plastic container, which was popular at the time the brand was developing its new packaging. *Id.* at 39:14-40:16 (Ben), 341:9-24 (Pete). Van Leeuwen's cursive script — always rendered in black — was a choice, as was its use of an exaggerated initial capital letter extending below the other letters of the brand's name. *Compare* JX05 (chosen design), *with* PX007 (Pentagram revised proposals). The "overall minimalistic

21

design aesthetic" was also an arbitrary selection.  Compl. ¶ 26; Tr. 118:23-19:4 (Ben); DX1058.  And the minimalist approach does not necessarily limit the range of design outcomes: Pentagram prepared seven different proposals — all minimalist — for Van Leeuwen, as well as variations on several of them.  *See* JX03.14-42 (Jan. 15, 2016 Pentagram presentation, initial designs); Tr. 55:2-59:12, 192:11-17 (O'Neill), 320:17-21:13 (Jen); JX04 (Jan. 27, 2016 Pentagram presentation, narrowed three designs); PX007 (Feb. 18, 2016 Pentagram presentation, revised designs).

Courts have regularly found similar packaging to be inherently distinctive.  For example, a liquor bottle that was made of clear glass bearing red, white, and black labels was "undeniably arbitrary."  *Paddington*, 996 F.2d at 584; *see also Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 193 (S.D.N.Y. 2008) (arbitrary mark was "printed in lowercase without punctuation," placed "on the top printed line on each product," and showed "a color scheme of white and metallic gray, with a thin horizontal stripe of color often separating those two colors").

Further, a trade dress is properly deemed arbitrary when "a huge number of articles written about the [plaintiff] have focused on the distinctiveness of their look."  *Best Cellars*, 90 F. Supp. 2d at 451.  Van Leeuwen's redesign received unsolicited press coverage — indeed, acclaim is not too strong a

word.  *See, e.g.,* PX015 (Fast Company article, Mar. 30, 2017); PX016 (Quartz article, Mar. 30 2017); PX017 (Design Week article, Apr. 3, 2017); PX020 (Azure Magazine article, May 15, 2017); PX021 (Dieline article, June 20, 2017); JX032 (Ateriet article, Sept. 1, 2017); PX038.8 (Unilever presentation at NOSH conference); Tr. 322:18-23:8 (Jen describing organic media attention).  This reaction also tends strongly to suggest arbitrariness.[8]

Van Leeuwen established that its trade dress is arbitrary, and therefore inherently distinctive.  It is thus unnecessary to consider whether the trade dress has developed secondary meaning.  *See Two Pesos*, 505 U.S. at 769.

3.    Van Leeuwen's Trade Dress Is Non-Functional

Only non-functional trade dress is protectable.  *See* 15 U.S.C. § 1125(a)(3); *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001).  There are two kinds of functionality: utilitarian and aesthetic.  "[A] product feature is considered to be 'functional' in a utilitarian sense if it is (1) essential to the use or purpose of the article, or if it

---

[8] Rebel argues that the news coverage Van Leeuwen received was primarily in industry articles that focus on Pentagram as the packaging designer, rather than specifically on Van Leeuwen.  Def.'s Post-Trial Br. 13.  It is unsurprising that Pentagram designs "pick[] up press attention," but that does not detract from the organic coverage of the Van Leeuwen design.  Tr. 323:1-8.  Jen testified that the wider press the design received was unsolicited.  *Id.* at 322:18-25.  And regardless, the Van Leeuwen trade dress received acclaim outside of design industry publications, such as *Fast Company*.  *See* PX015.

23

(2) affects the cost or quality of the article." *Christian Louboutin S.A. v. Yves St. Laurent Am. Holdings, Inc.*, 696 F.3d 206, 219 (2d Cir. 2012). "[A] mark is aesthetically functional, and therefore ineligible for protection under the Lanham Act, where protection of the mark *significantly* undermines competitors' ability to compete in the relevant market." *Id.* at 222.

Rebel's claim that Van Leeuwen's packaging is functional rests on two of the trade dress's elements: minimalism and pastel color. Minimalism is functional, according to Rebel, because "it is a *concept* that serves to signify product quality" and "it serves to emphasize the accompanying word mark, allowing the word mark to stand out." Def.'s Post-Trial Br. 9. The use of pastels, in turn, is a "correlation of color to flavor." *Id.* at 10 (citing *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197 (11th Cir. 2004)).

These arguments do not carry the day. As to minimalism, the trial evidence showed that many — if not most — ice cream manufacturers communicate their names effectively without a minimalist presentation. *See, e.g.*, DX1006.10-15 (competitors' packaging). If anything, Van Leeuwen's use of negative space in the service of a minimalist aesthetic is less functional than, say, a busier presentation featuring a

24

photograph of vanilla beans for vanilla, mint leaves for mint chip, and the like.  *Id.* at 10 (Ben & Jerry's); *id.* at 12 (Häagen Dazs).

Nor is the use of pastels inherently functional.  The trial evidence established that ice cream manufacturers can — and do — correlate color to flavor with *and without* using pastel shades.  Rebel may be correct that certain colors connote certain flavors: "yellow for vanilla, pink for strawberry, green for pistachio, and red for cherry," Def.'s Post-Trial Br. 10 — but it does not explain why the yellow for vanilla must (for functional reasons) be a *pastel* yellow.  Other packaging shown at trial uses conforming — but not pastel — colors in a manner correlating to flavor.  *See, e.g.*, DX1006.11 (Coolhaus "Dirty Mint Chip" in bright mint green); *id.* at 14 (Phin & Phebes "Banana Whama" in bright banana yellow).

Perhaps more importantly, several of Van Leeuwen's pastel shades do not clearly correlate to the assigned flavor at all.  There is little signaling value, for example, in the selection of periwinkle blue for Van Leeuwen's "Earl Gray Tea" ice cream package, DX1054.8, or in the selection of a light purple shade for the "Chocolate Fudge Brownie" flavor. DX1054.19.

Lastly on this point — but definitely not least — the operative legal question is not whether any individual *element*

25

of the defined trade dress is functional, but rather whether the trade dress itself is; the functionality analysis looks to the trade dress *as a whole*.  See *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir. 1985).

Therefore, Van Leeuwen's trade dress satisfies the non-functionality requirement.

4.    Van Leeuwen Has Established a Likelihood of Confusion

The final element of trade dress infringement is the likelihood of confusion.  Van Leeuwen alleges a likelihood of both forward confusion and reverse confusion, meaning a likelihood both that consumers would believe that Van Leeuwen is the source of Rebel's products and that Rebel is the source of Van Leeuwen's.  *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490-91 (2d Cir. 1988).[9]  "A plaintiff must prove a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers" to establish a likelihood of confusion.  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).  The factfinder may rely upon general knowledge, common experience, and the factors set out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

---

[9] We address the evidence in support of each theory of recovery separately, except where evidence supports both forward and reverse confusion.

*Polaroid* instructs courts to examine eight factors when assessing the likelihood of confusion:

> (1) strength of the trade[ dress]; (2) similarity of the [trade dress]; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative [trade dress] was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks*, 588 F.3d at 115. "[D]istrict courts should typically address all the *Polaroid* factors and, if [they] deem[] one of the factors irrelevant, explain why." *Souza v. Exotic Island Enters.*, 68 F.4th 99, 116 (2d Cir. 2023). "[C]ourts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins." *Playtex Prods. v. Ga.-Pac. Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).

a.   Strength of the Trade Dress

The first factor is the strength of the trade dress. "The strength of a trade[ dress] is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired

27

strength."  *RiseandShine Corp. v. PepsiCo, Inc*., 41 F.4th 112, 120 (2d Cir. 2022).[10]

Van Leeuwen's trade dress is strong.

As discussed above, it is arbitrary.  *See supra* Section II.A.2.  "When a mark has been deemed arbitrary, as opposed to generic, descriptive or suggestive, its very arbitrariness is an indicium of strength."  *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999).

As to acquired strength, we analyze "public recognition in the marketplace" and "longevity of use."  *RiseandShine*, 41 F.4th at 120, 124; *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 148 (2d Cir. 2003) ("If a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use.").  Courts consider "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use."  *Christian Louboutin*, 696 F.3d at 226.

---

[10] The Second Circuit has indicated that "a mark's inherent strength is a legal question."  *RiseandShine Corp. v. PepsiCo, Inc.*, No. 23-1176, 2024 WL 5165388, at *2 (2d Cir. Dec. 19, 2024).  The Circuits are split on this question, and the Supreme Court recently granted certiorari to resolve it.  *RiseandShine Corp. v. PepsiCo, Inc.*, No. 24-1016, 2026 WL 1855011 (U.S. June 29, 2026).  But our analysis of this issue would culminate in the same conclusion regardless of whether it is deemed an issue of law or fact.

Most relevant here are advertising expenditures, unsolicited media coverage, and sales success. "Advertising expenditures provide circumstantial evidence of the possible effect that advertising of the [trade dress] may have on consumers' association of it with the source of a product or service." *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 246 (S.D.N.Y. 2022). Van Leeuwen advertised its trade dress extensively on social media, in its shops, and in grocery stores. *See* PX249 (advertising spend 2014-2023); Tr. 194:14-97:19 (O'Neill). And as discussed above, Van Leeuwen received extensive unsolicited media coverage following the Pentagram redesign. *See supra* Section II.A.2. Finally, after the redesign, Van Leeuwen had significant sales success, with the company's growth rate increasing and gross wholesale sales doubling. Tr. 710:14-20 (Van Leeuwen profits expert Phillip Brida); PX249; JX09; Tr. 99:10-19 (Ben), 343:7-12 (Pete). Given these factors, its trade dress is strong.

b.   Degree of Similarity

The degree of similarity between Van Leeuwen and Rebel's packaging is analyzed based on the trade dress's "overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis*

29

*Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).

Rebel concedes that the brands' "packaging may appear similar on a surface level." Def.'s Post-Trial Br. 15. This is, to put it mildly, an understatement. The packages are similar both on the surface *and* upon closer examination. Rebel deploys all four elements of the Van Leeuwen trade dress, leaving a strikingly similar overall impression.

1. Both use pastel colors — indeed, sometimes the same colors for the same flavors. Tr. 420:18-22 (Austin describing why he picked pastel yellow packaging for vanilla pint); DX1054.17.

2. Both are monochromatic from the lid through the pint. *Compare* DX1054.03 (Choc Chip Cookie Dough Van Leeuwen), *with* DX1052J (Coffee Chip Rebel).

3. Both use a black script font for their logo, with Van Leeuwen's "L" and Rebel's "R" extending under the rest of the mark name. Tr. 501:8-13, 521:10-22:7; Compl. ¶ 12.

4. Both employ minimalism. On both packages, a significant amount of surface area — in a similar location on both designs — is devoid of text, pictures, or other design elements. *Compare, e.g.,* DX1054.16, *with* DX1052V.

Indeed, Rebel's packaging matches Van Leeuwen's even in ways that go *beyond* the claimed trade dress. The brands' social media handles are located in the same place on the pints. Tr. 225:7-22 (O'Neill), 420:23-21:8 (Austin). The brands also shift from a script font for the brand name to capital block

letters for the flavor name.  *Compare* DX1054.15 (Sicilian Pistachio Van Leeuwen), *with* DX1052S (Pistachio Rebel).

The absence of *other* similar brands is relevant when assessing the likelihood of confusion.  *E.g.*, *Fruit-Ices Corp. v. Coolbrands Int'l, Inc.*, 335 F. Supp. 2d 412, 420 (S.D.N.Y. 2004).  The trial evidence revealed no third brand's packaging that strongly resembled Van Leeuwen and Rebel.  No industry professional has ever identified Van Leeuwen's packaging as similar to another brand, besides Rebel.  Tr. 615:1-11 (Alexandra Wright, Executive Vice President for Van Leeuwen's consumer packaged goods segment).

Multiple industry professionals remarked on the brands' packaging similarities.  A Wegmans buyer told Austin that the brands' packaging was similar.  *Id.* at 425:9-14.  A Publix buyer stated concern that Rebel and Van Leeuwen could confuse customers because of their similarity before declining to stock Van Leeuwen.  *Id.* at 596:24-97:10, 600:2-8, 601:24-02:23, 605:20-06:5, 732:17-23.  This testimony is admitted over the defendants' hearsay objection.[11]  Ice cream brokers, too,

---

[11] The Court heard argument on whether the Publix testimony was admissible for a non-hearsay purpose.  *See, e.g.*, Tr. 598:18-601:8.  Neither party called the Publix buyer as a witness.  The testimony is admitted under Rule 807, as both parties agree that the statements were made.  *See* Closing Argument Tr. 88:17-89:2, 91:18-92:15, ECF No. 118.  The testimony is also admissible under Rule 803(3).  *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) (statement "I find these names confusing" is admissible as a "statement[] of the declarant's then existing state of mind").  Rebel's citation to *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984

noted the overlap, including some who Ernst & Young Parthenon ("EYP") interviewed as part of a market study they performed for Rebel. *See* JX17.154-55 (EYP interview summaries); Tr. 591:5-21; JX07 (Greenspoon Sales broker photo of Van Leeuwen and Rebel shelved together).

The Second Circuit has held trade dresses similar under these circumstances. For example, in *Paddington*, the panel found similarity because each party's liquor bottle labels' "lettering style, layout, and coloration, taken together, convey the same impression: a design that is simple, clean, and stark." 996 F.2d at 586. In *Wonderful Co. v. Nut Cravings Inc.*, the plaintiff's pistachio packaging was found to be similar to the defendant's based on "the likeness of core product-packaging features," including "prominence of the color scheme and typeface of the primary identifying words for the product." No. 23-7540, 2025 WL 212064, at *2 (2d Cir. Jan. 16, 2025).

Rebel cites *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, in which the prominence of the products' trade names on the packaging weighed heavily against confusion. 973 F.2d 1033, 1046 (2d Cir. 1992). But the Second Circuit has since

_____

F.2d 567 (2d Cir. 1993), is unpersuasive. In *W.W.W.*, the only evidence of actual confusion was that an "unidentified person" told the plaintiff's president of his confusion. *Id.* at 574. Here, we have an identified declarant, and both parties acknowledge that the relevant statements were made.

distinguished *Bristol-Myers*, noting that it discussed two of the most prominent pain killer brands, "Tylenol" and "Excedrin." *Fun-Damental*, 111 F.3d at 1003.  For lesser-known brands like Rebel and Van Leeuwen, the *Bristol-Myers* analogy does not carry the day.  Moreover, similarity is assessed in context — here, a grocery store freezer, through which packaging may be harder to distinguish.  *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1541 (11th Cir. 1986).

The only distinctions between Van Leeuwen and Rebel packaging are Rebel's keto elements.  Rebel's packaging contains two such features: the black circle stating the number of net carbs or net grams of sugar, and the language on the lid stating "keto, full fat, lactose free."  *See, e.g.*, DX1052T (Salted Caramel Rebel), Tr. 490:19-92:4 (Austin), 494:2-95:2.

But despite its keto features, for the reasons stated above, Rebel could be — and is — associated with Van Leeuwen in the market.  Thus, this factor strongly favors Van Leeuwen.

c.    Competitive Proximity

The third factor assesses competitive proximity.  This "inquiry concerns whether and to what extent the two products compete with each other."  *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 481 (2d Cir. 1996).  "To the extent goods . . . serve the same purpose, fall within the same general class, or are used together, the use of similar designations is

more likely to cause confusion." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991).  To determine proximity, we "look to the nature of the products themselves and the structure of the relevant market." *Cadbury*, 73 F.3d at 480.  We consider "class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Id.*  Van Leeuwen and Rebel are competitively proximate in two ways: their customers overlap, and they are physically proximate in stores.

First, Van Leeuwen and Rebel appeal to many of the same customers.  Tr. 75:25-76:1 (Ben), 579:3-5 (Wright).  Rebel contends that the only individuals who purchase its ice cream are those with dietary restrictions.  *Id.* at 442:22-43:7 (Austin).  But Rebel's own documents disprove this.  In early 2020, Rebel commissioned EYP to conduct a market study.  *Id.* at 436:12-37:4.  EYP found that "Rebel's direct competitive set is other [better-for-you ("BFY")] ice cream brands, and its secondary competitive set includes premium ice cream brands," such as Van Leeuwen.  PX074.9 (March 2020 EYP study).  Additionally, "[p]remium ice cream brands such as Haagen-Dazs and Talenti view BFY brands like Rebel as competitors because they share consumers and acknowledge the popularity of BFY foods."  *Id.*  Twenty percent of Rebel customers have no dietary restrictions, and a majority bought traditional ice cream prior

to purchasing Rebel.  *See id.* at 74.7; PX093 (Aug. 28, 2020 email); PX094.5 (Harris Williams presentation on Rebel); Tr. 458:21-59:3; 460:23-61:11.  Rebel recognizes that "indulgent consumers" alternate between BFY ice cream purchases like Rebel and indulgent brands like Van Leeuwen.  *See* PX059 (Feb. 6, 2020 email); Tr. 431:16-33:2.

Because of this overlap, Van Leeuwen and Rebel advertise their products and packaging to the same "mainstream" customers. PX093 (Aug. 28, 2020 email); Tr. 194:14-95:24 (O'Neill), 197:18-19, 199:12-21, 459:5-20 (Austin), 462:16-66:10; PX259 (Rebel TikTok); PX264 ("Feel Better" ad campaign); PX183 (Van Leeuwen's website homepage).

Rebel's packaging also contributed to this alignment with premium ice creams.  EYP wrote in its study that "[r]etailers . . . increasingly place Rebel with super-premium brands and Rebel's packaging resembles super-premium brands rather than BFY brands, aligning it more closely with super-premium than BFY products."  PX074.9 (March 2020 EYP Study); PX137.9 (Harris Williams presentation on Rebel); Tr. 462:10-15; PX094.7 (August 2020 Harris Williams presentation).  One industry buyer that EYP interviewed explained, "when you look at [Rebel's] — if you're just a regular ice cream eater not looking for an alternative, theirs looks like [premium ice cream].  And so I think they live in that great space of, 'Hey.  Is this Van

35

Leeuwen out of Brooklyn that's just fantastic dairy-milk ice cream?'  Until you pick it up, you don't really recognize that it's an alternative."  JX17.154-55 (EYP interview summaries).

Also, Van Leeuwen and Rebel are distributed at the same grocery stores — often on the same shelf — and are frequently intermingled.



JX07 (photo from Midwest store).[12]  Rebel's founder insisted that its ice cream was rarely next to Van Leeuwen in grocery stores. Tr. 455:18-56:4; 555:7-16.  But the only evidence the brands are infrequently shelved together lacked credibility.  Rebel's expert relied on disjointed photos of Van Leeuwen and Rebel on separate freezer shelves, but Van Leeuwen realigned those exact

_____

[12] *See also, e.g.*, PX112 (screenshot of Instagram depicting Whole Foods); PX164 (Instagram depicting KCF Co-op in Philadelphia, PA); PX194 (photo of Austin, TX Walmart, *see also* PX269 (Keare Decl.)); PX196 (photo from Citarella in New York); PX218 (photo from Citarella in New York); PX214 (photo from Tom Thumb in Fort Worth, TX); PX191 (photo from Lassens in Los Angeles, CA); PX241 (photo from a Lassens grocery store in Los Angeles, CA); PX240 (photo from a Walmart in the Washington, DC area); PX238 (photo from Walmart in Burbank, CA); PX243 (same); PX261 (photo from DeCicco & Sons in Harrison, NY).

photos to show that Rebel and Van Leeuwen *were* shelved together. *See* PX268 (realigned Whole Foods images); Tr. 848:20-51:19.

This factor favors Van Leeuwen.

d.    Bridging the Gap

This factor "examines whether the prior user" — here, Van Leeuwen — "may wish to enter the defendant's market in the future." *Paddington*, 996 F.2d at 586.  As discussed, Van Leeuwen and Rebel already operate in the same grocery store ice cream market. *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 74 (S.D.N.Y. 2021) (bridging the gap is not relevant if two products are already in competitive proximity). This factor is thus irrelevant.

e.    Actual Confusion

"Evidence that confusion has actually occurred is of course convincing evidence that confusion is likely to occur." *Morningside*, 182 F.3d at 141.  Plaintiffs often seek to satisfy the "actual confusion" element by presenting anecdotal evidence or conducting consumer surveys.  Neither, however, is *required*. "[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986); *see also Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 656

37

(2d Cir. 1989) (noting that the Circuit had upheld a jury finding of actual confusion, "despite [the] fact that the plaintiff presented no surveys or anecdotal evidence of such confusion").  Finally, we consider intent: "evidence of intentional copying gives rise to a presumption of actual confusion."  *Coty, Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 449 (S.D.N.Y. 2017); *see infra* Section II.A.4.f (finding intentional copying and bad faith).

        i.      Consumer Confusion

Here, Van Leeuwen did introduce substantial anecdotal evidence indicating actual confusion.  For instance, Rebel itself received a report from a confused consumer in August 2024.  She wrote that her husband purchased Rebel "by accident when I sent him to the store for Van Leeuwen," because "your product was placed right next to Van Leeuwen and looked the same . . . . I nearly did the same thing when I shopped!  Later, my friend shared the same experience on the other side of the country!"  JX33.  This single incident, anecdotal though it may be, remains meaningfully probative: such reports are expected to be rare when the products at issue are inexpensive and consumers' incentive to complain about confusion is therefore diminished.  *Coty*, 277 F. Supp. 3d at 453 ("[C]ommon sense dictates that consumers are less likely to take the time to

complain where, as here, the allegedly infringing product is relatively inexpensive.").

ii.    Grocery Store Employees' Confusion

The evidence revealed confusion even on the part of store professionals.  Grocery store employees confused the brands, as noted above in Section I.G; this was "evidence of limited actual confusion that extends beyond [plaintiff's] consumers." *Fruit-Ices*, 335 F. Supp. 2d at 426-27.  The testimony revealed that store employees unintentionally applied Rebel price tags to Van Leeuwen pints and intermingled the brands.  *See, e.g.*, Tr. 82:20-84:17 (Ben discussing PX196); 84:18-86:25 (discussing PX218), 355:21-56:21 (Pete discussing PX243), 357:3-59:4 (discussing PX238), 359:5-60:19 (discussing PX240), 554:18-55:6 (Austin), 613:23-14:6 (Wright).  At Walmart, Van Leeuwen was supposed to have designated shelf space. Tr. 612:11-13:11; *see also id.* at 539:2-6 (Austin discussing Rebel's designated shelf placement).  Even there, however, Van Leeuwen was *still* frequently shelved with Rebel.  Tr. 611:24-13:22 (Wright), 404:1-7 (Pete).

iii.    Survey Evidence

Van Leeuwen also submitted survey evidence that suggests consumer confusion, but Rebel challenges its methodology.  Van Leeuwen's expert, Mark Keegan, conducted a "*Squirt*" survey to assess reverse confusion between Van

39

Leeuwen's pints and Rebel's. *Id.* at 631:21-33:18 (Keegan), 804:16-20 (Rebel's rebuttal expert, Keith Botner); *see Squirt Co. v. Seven-Up Co.*, 480 F. Supp. 789 (E.D. Mo. 1979). In a *Squirt* survey, participants are shown an array of trademarks (or trade dresses) and asked questions about whether they believe the items in question originate from the same corporate source. Tr. 804:16-20.

In Keegan's survey, participants were placed in four groups. First, they were all shown the Rebel packaging, followed by Van Leeuwen, Häagen Dazs, Jeni's, and Serendipity, in random order; then Rebel's again. *Id.* at 652:6-25, 670:20-23. Then, depending on what group they were in, they were shown a "test cell" that included only one of Van Leeuwen, Häagen Dazs, Jeni's, or Serendipity. *Id.* at 654:14-19. After that, they were asked up to three questions in random order about whether they perceived a connection between Rebel and the test cell. *Id.* at 654:24-56:10. If they answered yes to any one of those questions, they were then asked an open-ended question: "What makes you say that?" *Id.* at 655:25-56:5.

To evaluate the reliability of a survey, we consider whether

> (1) the proper universe was examined and the
> representative sample was drawn from that universe;
> (2) the survey's methodology and execution were in
> accordance with generally accepted standards of
> objective procedure and statistics in the field of

such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.

*Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738 (S.D.N.Y. 2011). Only the first three factors are at issue here. Def.'s Post-Trial Br. 20.

**Participants.** Keegan selected the proper universe of participants: likely purchasers of premium ice cream pints. Rebel contends that Keegan's universe was not reliable because he considered both past purchasers and likely future purchasers. But "[c]ourts have frequently admitted consumer confusion studies . . . whose universe included past purchasers alongside potential future purchasers." *Capri Sun*, 595 F. Supp. 3d at 124 (collecting cases). Past purchasers are especially relevant "where the consumer good at issue is inexpensive and frequently or routinely bought." *Id.* Indeed, the *Capri Sun* court found no support in the case law for the argument Rebel makes here. *See id.* at 124-25. Keegan made reasonable survey design choices, reflective of the product at issue in this case.

**Methodology.** Keegan's survey methodology was reliable. The three controls — Häagen-Dazs, Jeni's, and Serendipity — were selected because they were in cardboard packaging, had multiple flavors, and were sold in grocery stores. Tr. 642:1-4, 643:11-21. Keegan aimed to control for "a

41

range of potential familiarity" by choosing Häagen-Dazs, "one of the best-known brands"; Jeni's, a "national brand but less well-known"; and Serendipity, a "regional brand." *Id.* at 643:22-44:10.  The controls accounted for "demand effects," which occur when participants "want to please the interviewer" by finding an association that "in the real-world marketplace would not occur." *Id.* at 689:15-90:3, 821:22-25 (Botner).  The survey employed randomization and procedures to minimize guessing. *Id.* at 658:21-59:7 (Keegan).  These are reliable survey-design practices. *E.g.*, *Easy Spirit*, 571 F. Supp. 3d at 199 (affording "great weight" to a *Squirt* survey that used controls and randomized question orders).

Rebel contends that the Van Leeuwen survey did not use proper controls — that is, other brands deployed to identify background noise or error — because the brands Keegan selected differed too significantly from the Van Leeuwen trade dress. *See* Def.'s Post-Trial Br. 20.  But Rebel's rebuttal expert, Dr. Botner, could not propose a better alternative.  In fact, he vacillated on the key question of whether ideal controls would or would not have had pastel and / or monochromatic packaging. In Botner's rebuttal report, every alternative control he proposed used matching monochromatic lids and pints, and most used pastels. *Id.* at 838:5-39:5; PX273.15 (Botner Slide 15). But at trial, he said that if a control used pastel or

42

monochromatic packaging, it would be "categorically inappropriate." Tr. 837:14-38:4, 838:24-39:5. Regardless, Keegan's decision was justified. "[A] control that also infringes [Van Leeuwen's trade dress] must be disregarded," which may explain why he selected controls that shared some, but not all, of the Van Leeuwen trade dress elements. *Jackpocket*, 645 F. Supp. 3d at 266.

*Questions.* Moreover, the survey questions themselves were reliable: the use of "open-ended questions about confusion decreased the possibility that his data were skewed" by biased responses. *Id.* at 267. Rebel argues that the Van Leeuwen survey was leading because, in its view, the survey should have shown participants all four non-Rebel packages, rather than only one of them, before asking about a perceived association. *See* Mot. to Exclude Keegan 8-10, ECF No. 75; Tr. 805:18-24. But Rebel's proposed design would likely produce a higher confusion rate by essentially asking respondents to "match" one of the products to Rebel. Tr. 659:24-61:10.

*Results.* The survey results clearly demonstrated confusion. A 15% net confusion rate is generally considered sufficient to demonstrate actual confusion; Keegan's survey yielded a net confusion rate of 34.3%. *See Capri Sun*, 595 F. Supp. 3d at 171 n.39 (collecting cases); Tr. 633:24-34:16, 661:11-63:2, 663:22-64:10. The participants' responses to

43

Keegan's open-ended questions further support a finding of actual confusion.  Participants observed that the two brands' packaging "looks identical" and is "almost the same."  Tr. 663:4-21.

The survey results are persuasive that there is actual reverse confusion in the marketplace above the accepted threshold.

Based on Van Leeuwen's survey, grocery employee confusion, and the unusual, reported instance of consumer confusion, the Court finds that there is evidence of actual confusion in the marketplace between Van Leeuwen and Rebel.

f.   Bad Faith

The next factor assesses whether Rebel adopted its trade dress in bad faith, which concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  *Lang*, 949 F.2d at 583.  Bad faith is presumed when there is "evidence of intentional copying."  *Charles of the Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1322 (2d Cir. 1987).  Here, the "overall appearance of the two lines of products is too similar even to entertain the idea that [Rebel] did not mimic" Van Leeuwen's trade dress.  *Clinique Lab'ys, Inc. v. Dep Corp.*, 945 F. Supp. 547, 555 (S.D.N.Y. 1996).

44

The conclusion that the Archibalds acted in bad faith cannot be avoided here.  To be blunt, their testimony concerning the development of Rebel's packaging was clearly fabricated.

For starters, "reasonable minds might question the likelihood that the person who designed Defendant's marks could have produced a design so nearly identical to Plaintiff's without ever having seen it."  *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 44 (2d Cir. 2016); *TushBaby, Inc. v. Jinjiang Kangbersi Trade Co.*, No. 24-CV-6150, 2024 WL 4627452, at *7 (S.D.N.Y. Oct. 30, 2024).  Here, the two packages share a bevy of what would otherwise be random features: the pastel background, when pastels make up a relatively small portion of the color wheel.  The use of black, and no other color, for the writing on the package.  The script, which is only one of a virtually endless number of fonts.  The large-scale initial capital letter — an unusual flourish.  The fact that the initial capital sweeps under the subsequent lettering in the brand name.  The vertical positioning of the brand name on the carton.  The shift from script (for the name of the brand) to block lettering for other text on the package front.  The location of social media information.  And on and on.  The likelihood of all these design features converging at random is infinitesimal.

Equally suspicious is the Archibalds' claim to have saved none of their work product from the design effort (and their explanation for that decision).  Tr. 497:1-98:25; *see Best Cellars*, 90 F. Supp. 2d at 457 (observing that "the complete absence of *any* preliminary design sketches" was suggestive of bad faith).  Austin Archibald claimed, without explanation, that saving this work product "wouldn't make sense."  Tr. 497:15-18. As a result, Rebel produced literally no documents capturing the development of Rebel's packaging that predate the final product. *Id.* at 497:1-3 (Rebel created no mock-ups), 560:23-25 (Courtney), 561:16-21.  The first available rendering of Rebel's packaging appears in a 2018 email from Austin to Rebel's co-packer, Stanpac, which shows a completed design.  *Id.* at 418:16-19:9; *see* PX029 (email).  Rebel argues that "a husband and wife with four young children making design decisions in real time using Adobe Illustrator on a laptop in their home," cannot be expected to have a "record retention system like that of a professional design team."  Def.'s Post-Trial Br. 21.  This beggars belief: as the design process is an iterative and time-intensive one, the incentive to save earlier versions is high.

Other testimony highlighted the implausibility of the Archibalds' claim that they never saw Van Leeuwen's packaging. Tr. 426:5-12.  Though Austin Archibald went to HBS and focused on market research, *id.* at 405:9-21, he claimed he did "minimal

46

research" outside of "better for you" brands and never ran a single Google search for ice cream. *Id.* at 407:16-08:9, 409:22-10:13. He claimed to have visited only one grocery store to look at ice creams — his local one — even though Rebel sought national distribution. *Id.* at 408:4-12, 412:25-13:22.

Courtney Archibald never ran Google searches, either, because she isn't "technically minded." *Id.* at 410:16-20 (Austin). *But* Courtney knew how to Google "ice cream packaging," and used Pinterest to follow trends. *Id.* at 410:25-11:5, 559:12-61:8; PX236 (Courtney's Pinterest). Despite their testimony, the founders created a product bearing striking similarity to the Van Leeuwen trade dress. *TushBaby*, 2024 WL 4627452, at *7 (defendants' assertion that they had "no knowledge of Plaintiff before being sued by Plaintiff" was not believable due to "uncanny resemblance" to plaintiff's trade dress); *see also supra* Section II.A.4.b.

Austin Archibald's testimony concerning his first (supposed) encounter with Van Leeuwen was inconsistent: at his deposition, he stated that he was "not surprised" when he Googled Van Leeuwen after the Wegmans meeting. Tr. 427:5-11. At trial, however, he admitted being "a little surprised" by the similarities, stating that "when you're in a meeting with a buyer, you do not want your packaging . . . to look like another

47

brand.  The whole point of it is to stand out."  *Id.* at 426:21-27:2.

Austin Archibald was also shaky in his explanation of the EYP brand study that he commissioned (and for which Rebel paid $300,000).  *Id.* at 439:11-20; PX62 (emails confirming price); PX67 (same).  He was presented, at trial, with several of EYP's conclusions that Rebel "has broader market appeal to serve a general population that seeks a premium tasty ice cream" and that Rebel was in the same competitive space as premium brands like Van Leeuwen.  Tr. 441:14-44:12.  Austin disagreed with these conclusions at trial, but did not say he communicated to EYP that they were misapprehending the market.  *Id.* at 442:6-7.  And despite his background, he seemed to not understand numerous basic marketing concepts.  For example, when asked about whether he "read any reports" when doing market research for Rebel, he asked for a definition of "report."  *Id.* at 408:13-20.  And when asked whether he agreed that "Rebel's direct competitive set is other BFY ice [cream] brands and its secondary competitive set includes premium ice cream brands," he asked for an explanation of "what's direct versus secondary."  *Id.* at 442:11-16.  Such testimony calls into question his credibility.

Thus, Rebel acted in bad faith.  This factor favors Van Leeuwen.[13]

g.   Product Quality

The penultimate factor is product quality.  Given the trial evidence that both products are of premium quality, this factor is neutral.

h.   Consumer Sophistication

The final factor assesses consumer sophistication. "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress . . . will result in confusion concerning the source or sponsorship of the product." *Bristol-Myers*, 973 F.2d at 1046.

Rebel argues that its ice cream is "purchased by sophisticated, diet-conscious customers who do not typically buy full-sugar ice creams."  Def.'s Post-Trial Br. 18 (citing Tr. 475:21-76:10, 490:19-91:21).  But consumers do not focus on ice cream purchases as they would a television or automobile. The Second Circuit "has associated the purchase of low-cost

---

[13] Rebel argues that it cannot have acted in bad faith because the USPTO did not find a likelihood of confusion between Rebel's word mark and Van Leeuwen's.  *See* Def.'s Post-Trial Br. 17.  However, the USPTO evaluates word marks in isolation — not the trade dress.  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 160-61 (2015) (Ginsburg, J., concurring) ("registrations are often decided upon a comparison of the marks in the abstract and apart from their marketplace usage").  Thus, the agency's finding of no likelihood of confusion for registration is not dispositive. *Kohler Co. v. Bold Int'l FZCO*, 422 F. Supp. 3d 681, 729 (E.D.N.Y. 2018).

goods in a supermarket environment with low customer sophistication." *Starbucks*, 588 F.3d at 118-19.  The average ice cream consumer is not sophisticated.  Ice cream is an "impulse item[]" sold to "hurried shoppers."  *AmBrit*, 812 F.2d at 1541.  Customers look at packaging only briefly before purchasing.  Tr. 231:4-13 (O'Neill), 592:21-25 (Wright).  This factor favors Van Leeuwen.

*    *    *

In total, the *Polaroid* factors militate overwhelmingly in favor of the Court's conclusion that a significant likelihood of both forward and reverse confusion exists between Van Leeuwen's trade dress and Rebel's.  Six factors favor Van Leeuwen (some of them strongly).  These include strength of the trade dress, similarity, competitive proximity, actual confusion, bad faith, and consumer sophistication.  The other two factors, bridging the gap and product quality, are irrelevant and neutral, respectively.

Rebel is liable for infringing Van Leeuwen's trade dress.  15 U.S.C. § 1125(a); *id.* § 1114(1).[14]  Accordingly, Rebel's counterclaims are denied.

---

[14] In its first cause of action, in addition to trade dress infringement, Van Leeuwen also alleged false designation of origin and unfair competition under the Lanham Act.  Compl. ¶¶ 35-41.  At least two Second Circuit cases treat "false designation of origin" as a version of trade dress infringement, rather than an independent cause of action.  *See Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 188 (2d

**B.    New York Common Law Trade Dress Infringement and Unfair Competition**

In addition to its Lanham Act claims, Van Leeuwen brings common law claims for trade dress infringement and unfair competition.  "The standard for proving trade dress infringement under New York common law generally parallels the standard under the Lanham Act, except that there is no requirement to show secondary meaning for distinctive designs."  *Capri Sun*, 595 F. Supp. 3d at 187.  Therefore, for the same reasons as the Court finds Rebel liable on the Lanham Act claim, Rebel is liable for common-law trade dress infringement.  "A common law unfair competition claim under New York law is identical to a Lanham Act claim, save for the additional requirement that plaintiff show defendant's bad faith."  *Id.* at 187-88.  Rebel clearly acted in bad faith.  Therefore, Rebel is liable for common-law unfair competition.

**C.    New York Trade Dress Dilution**

Van Leeuwen has also brought a claim for dilution in violation of New York GBL § 360-l.  To prove dilution, Van

---

Cir. 1980); *see also Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129-30 (2d Cir. 2004) (describing false designation of origin as a separate cause of action from imitation of a registered mark, but analyzing the two claims together).  Even if it is a distinct cause of action, its elements have complete overlap with those of trade dress infringement.  *See* Joint Proposed Jury Inst. 20, ECF No. 95 (citing ABA Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation, § 2.4.3 (2008)) (listing elements (a) plaintiff owns a valid trade dress; and (b) the defendant's use of the trade dress is likely to cause confusion as to the origin, sponsorship, or approval of the defendant's goods).  Thus, the Court does not separately address this claim.

Leeuwen must demonstrate that (1) its trade dress is inherently distinctive or has acquired secondary meaning; and (2) blurring or tarnishment.  *See N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC*, 293 F.3d 550, 557-58 (2d Cir. 2002).[15]  New York law does not require a mark to be "famous" for protection against dilution.  *See Starbucks*, 588 F.3d at 114.

1.    <u>Van Leeuwen's Trade Dress Is Inherently Distinctive</u>

As discussed above, Van Leeuwen's trade dress is inherently distinctive because it is arbitrary and fanciful.

2.    <u>Rebel Has Blurred Van Leeuwen's Trade Dress</u>

Blurring occurs when "the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product."  *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 42 (2d Cir. 1994) (emphasis omitted).  To determine the likelihood of blurring under New York law, courts consider six factors: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the

---

[15] Tarnishment is not relevant in this action.  It occurs when "a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context." *Id.* at 558.  Van Leeuwen has not alleged that Rebel's ice cream is unwholesome or of poor quality.

senior mark; and (vi) the renown of the junior mark." *N.Y. Stock Exch.*, 293 F.3d at 558.

The *Polaroid* factors overlap significantly with the elements of blurring. But one factor, "similarity of the marks," warrants additional elaboration. New York law does not permit a dilution claim unless the parties' trade dresses are "substantially" similar — meaning more similar than the "familiar test of similarity used in the traditional infringement context." *Starbucks*, 588 F.3d at 114; *Easy Spirit*, 515 F. Supp. 3d at 77. To prove dilution, the "[m]arks must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." *Miss Universe, L.P. v. Villegas*, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009).

Van Leeuwen has satisfied this heightened standard. As discussed above, the "degree of similarity" *Polaroid* factor strongly favored Van Leeuwen, as Rebel's trade dress was a close "sibling" of Van Leeuwen's. And when analyzing "actual confusion," the Court also found that industry professionals, consumer survey respondents, and at least one customer were confused about the distinction between the brands. Therefore, the brand's trade dresses are substantially similar.

The *Polaroid* analysis supports a finding of blurring, and thus dilution under New York law.

**D.    Rebel's "Good Faith Remote User" Defense**

Rebel raises an affirmative defense that it was a "good faith remote user" of a similar trade dress to Van Leeuwen.  Under this defense, a senior user cannot enjoin a junior user's use of a similar trade dress if the junior user can prove (1) it "first used the mark in a geographically remote location, defined as an area in which the senior user's mark was not known such that there would be confusion as to source"; and (2) its "first use of the mark was in good faith."  *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 245 (E.D.N.Y. 2009).

> 1.    Rebel Has Not Shown that Its First Use Was in an
>        Area Where the Van Leeuwen Trade Dress Was
>        <u>Unknown</u>

Rebel cannot prevail on its affirmative defense because it first used its packaging in a region where Van Leeuwen was already sold.  "A 'remote' territory is one where, at the critical date of the junior user's first use, the senior user's mark was not known by customers in that territory, such that no one would have been confused as to source."  4 McCarthy on Trademarks and Unfair Competition § 26:4 (5th ed.).  First use refers to the location of first sales.  *See Nat'l Ass'n for Healthcare Commc'ns, Inc. v. Cent. Ark. Area Agency on Aging, Inc.*, 257 F.3d 732, 735-36 (8th Cir. 2001); *see also* 4 McCarthy § 26:30.50 ("It is the location of customers that indicates the extent of territorial penetration.").

Van Leeuwen was known to customers in California, where Rebel first used its packaging.  Van Leeuwen launched in California in 2016 and was sold in the Los Angeles area. Tr. 348:10-49:1 (Pete).  In 2018, Rebel began selling its pints in Lassens in Los Angeles.  *Id.* at 425:22-24; 428:15-21.

It is irrelevant that Van Leeuwen began sales in Utah, Rebel's home state, more than a year after Rebel launched its ice cream.  *Id.* at 348:19-24 (Pete).  The relevant inquiry is whether Rebel's first use was in a market where Van Leeuwen was also sold — and, as Rebel acknowledges, it was.  *See* 4 McCarthy § 26:30.50; Tr. 428:15-25.  Thus, Rebel was not a remote user of the Van Leeuwen trade dress.

2.    Rebel Has Not Established that Its First Use Was in Good Faith

Even if Rebel was a remote user of the trade dress, Rebel has not established that it acted in good faith.  As noted above, *Polaroid's* bad faith factor weighs strongly in favor of Van Leeuwen.  *See supra* Section II.A.4.f.  Thus, Rebel cannot meet its burden to prove the good faith remote user defense.

**E.   Remedies**

Van Leeuwen, having established Rebel's liability on all counts, seeks a permanent injunction and an accounting of Rebel's profits.  Both forms of relief are authorized under the Lanham Act, and injunctive relief is also available for

55

violations of the state-law claims.  15 U.S.C. §§ 1116(a) (injunctions), 1117(a) (profits); N.Y. Gen. Bus. Law § 360-l (injunctive relief available for New York dilution liability); *Com. Foods, Inc. v. PLC Com. Corp.*, 504 F. Supp. 190, 193 (S.D.N.Y. 1980) (injunctive relief available under New York trade dress infringement).  Rebel claims Van Leeuwen has made no showing that either form of relief is appropriate.  We disagree, and grant an injunction and profits as set forth below.

1.    Injunctive Relief

Van Leeuwen seeks an injunction to stop Rebel from continuing to sell ice cream pints bearing the infringing trade dress and from using any trade dress in the future that is confusingly similar to the Van Leeuwen trade dress.  Pl.'s Post-Trial Br. 22.  Rebel contends that injunctive relief is inappropriate because Van Leeuwen never sent Rebel any objection to its packaging prior to filing suit; never sought a temporary restraining order or preliminary injunction; and despite the current trade dress being on the market for over six years, Van Leeuwen has not suffered any actual damages.  Def.'s Post-Trial Br. 22-23.  None of Rebel's arguments is persuasive.

Van Leeuwen is entitled to a permanent injunction once it establishes "(1) actual success on the merits and (2) irreparable harm."  *Coty*, 277 F. Supp. 3d at 463.  The following four factors are relevant: "(1) the likelihood that the

56

plaintiff will suffer irreparable harm in the absence of an injunction, (2) whether remedies at law (such as monetary damages) are adequate to compensate the plaintiff for that harm, (3) whether the balance of hardships tips in the plaintiff's favor, and (4) whether the public interest would be served by the issuance of an injunction." *Id.* All four factors favor enjoining Rebel.

*Irreparable Harm.* "Irreparable harm is established if there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Id.* Because Van Leeuwen has established likelihood of confusion, as discussed above, this factor favors Van Leeuwen.

*Adequacy of Damages.* "Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate [those] injuries." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013). In the dilution context, "a plaintiff has no adequate remedy at law if, absent an injunction, the defendant is likely to continue diluting its trade dress rights." *Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*, 626 F. Supp. 3d 635, 655 (S.D.N.Y. 2022). Both are true here. Absent an injunction, Rebel intends to continue using the

same trade dress, and, as established above, confusion is likely.  This factor favors Van Leeuwen.

*Balance of Hardships.*  The balance of hardships tips in Van Leeuwen's favor because there is a substantial likelihood of consumer confusion and Van Leeuwen is the senior user.  *See U.S. Polo*, 800 F. Supp. 2d at 541 (finding the balance of hardship favors the more established company).  Further, Rebel has alternative packaging designs available to it — for example, it already uses different packaging for its sorbet line — and can readily create new packaging.  Tr. 562:8-63:6 (Courtney discussing Rebel's sorbet packaging); JX24.  The only hardship Rebel identifies is that it has used its current packaging for over six years.  Def.'s Post-Trial Br. 23.  But on this score, Rebel contradicts itself (at least in part) – contending, on the one hand, that it would be unduly burdened by having to abandon its longstanding package design, and (on the other) that packaging is a *de minimis* factor driving its sales.  *See below* Section II.E.2.c (discussing Rebel's argument that packaging is *de minimis*).  And in any event, any hardship associated with requiring Rebel to change its packaging does not outweigh the harm to Van Leeuwen.  *Diageo*, 626 F. Supp. 3d at 655; *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) (discussing, in the copyright context, how "an infringer . . .

58

cannot complain about the loss of ability to offer its infringing product").

*Public Interest.*  "The consuming public has a protectable interest in being free from confusion, deception and mistake."  *U.S. Polo*, 800 F. Supp. 2d at 541.  Because of the likelihood of confusion in this case, the public interest would be served by the issuance of a permanent injunction.

Therefore, Rebel is enjoined from selling products that bear trade dress likely to be confused with Van Leeuwen's, and it must redesign its packaging to convey a substantially different commercial impression.  The new packaging must not use the Van Leeuwen trade dress elements.

2.    Accounting of Profits

Van Leeuwen also seeks an accounting of Rebel's profits and an award of $36.4 million.  Pl.'s Post-Trial Br. 25. Rebel claims that a profits award is inappropriate.  It pegs its profits since inception at $35.5 million "at most," and goes on to argue that any award should be limited to $5 million.  Def.'s Post-Trial Br. 23-24.  The Court must first consider whether an accounting of profits is appropriate; then calculate profits, with the burden on the defendants to "prove all elements of cost or deduction claimed," 15 U.S.C. § 1117(a); then equitably adjust the award if excessive.  *Coty*, 277 F. Supp. 3d at 465-67;

59

*Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, 959 F.3d 903, 913-14 (8th Cir. 2020).

> a.    An Accounting Is Appropriate

Before determining the exact profits award, the Court first must determine that profits are an appropriate remedy in this case.  There are three rationales underlying an award of profits: "(1) to avoid unjust enrichment; (2) as a proxy for plaintiff's actual damages; and (3) to deter infringement."  *4 Pillar Dynasty LLC v. N.Y. & Co., Inc.*, 933 F.3d 202, 212 (2d Cir. 2019).

We consider the following factors: "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands."  *Id.* at 214.  Factors 1-3 and 5 favor Van Leeuwen; factor 4 is, at most, neutral.  There is no doubt that Rebel benefitted from the infringement, nor that Rebel singlehandedly effectuated the infringement.  No trial evidence suggested unclean hands on Van Leeuwen's part.  As to other remedies, Van Leeuwen has not sought lost profits or other monetary remedies that would make an award of profits inequitable.  *See, e.g.*, *L&L Wings, Inc v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 367 (S.D.N.Y. 2010) (holding that "an

accounting would unjustly overcompensate for [p]laintiff's actual injury and create a windfall judgment" where plaintiff would already recover under a liquidated-damages provision). Rebel's only argument is that Van Leeuwen delayed bringing this action.  But Rebel did not plead laches as an affirmative defense.  And that defense would not apply here.  "There is a presumption against laches where the lawsuit was initiated within the applicable statute of limitations," as is the case here.  *Gross*, 641 F. Supp. 2d at 196.  Therefore, on balance, an award of profits is justified.

A finding of willfulness, while not required, may also support an award of profits.  *Romag Fasteners, Inc. v. Fossil*, 590 U.S. 212, 219 (2020).  Willfulness requires "(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard . . . or willful blindness."  *4 Pillar*, 933 F.3d at 209-10.  This, too, favors Van Leeuwen.  As discussed above, Rebel acted in bad faith, and continued to infringe the Van Leeuwen trade dress after Austin was notified that Rebel's trade dress was similar to the Van Leeuwen trade dress.  Tr. 421:9-25.

Therefore, an accounting of profits is appropriate.

b.   Computation of Costs

Van Leeuwen and Rebel differ in their profits calculations.  "In assessing profits the plaintiff shall be

required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).  Van Leeuwen claims Rebel's net revenue is $247.2 million with incremental costs of $210.8 million, resulting in total profits of $36.4 million from sales of pints bearing the infringing trade dress.  Tr. 723:13-19 (Brida).  Rebel counters, arguing that Van Leeuwen's expert improperly "normalized" travel and entertainment costs between 2022 and 2024 by reducing them to match the travel and entertainment costs from 2019 to 2021, rather than using Rebel's actual costs.  *Id.* at 722:3-23:10.  Brida's hypothetical reduction led to an overestimate in profits, because it treated Rebel's travel expenses as if they had stayed as low as during the COVID-19 pandemic, when travel was restricted.  *Id.* at 757:11-58:9 (Cragun); JX31 (Income Statement, line 6600, demonstrating actual travel and entertainment costs).  Rebel's actual calculations carry the day over Brida's hypothetical.  Rebel has satisfied its burden that the profits award should be reduced to $35.5 million.

Rebel tries to argue that its "low-sugar, keto-friendly ice cream *product* was the predominant factor driving sales [which] also should further drive down any award."  Def.'s Post-Trial Br. 24.  But Rebel has employed no reliable formula or method for reducing the profits award based on causation.

62

Rebel has not met its burden for a precise reduction on this basis.

c.    Reduction of Profits

Nonetheless, given the imperfect market overlap between Rebel and Van Leeuwen and the complications in the causation analysis, we consider whether some additional reduction in the award would be warranted.  Awards of profits under the Lanham Act are "subject to the principles of equity," 15 U.S.C. § 1117(a), and reductions may be warranted when "causation problems" problems exist and / or the full award of profits would be "excessive."  *Lawn Managers*, 959 F.3d at 914. Even when a plaintiff establishes that the defendant's infringement was willful, courts must consider "whether the disgorgement of *all* profits attributable to the infringing product is necessary to achieve the desired deterrent effect." *4 Pillar*, 933 F.3d at 214.  Here, Van Leeuwen seeks 100% of Rebel's profits, but such an award would be excessive. Principles of equity favor reducing Van Leeuwen's profits award by 33%.

Rebel's success was at least partially driven by the keto trend.  Ben Van Leeuwen admitted at trial that keto ice creams were popular in 2018 (though they have become less popular since).  Tr. 160:21-61:12.  Indeed, Rebel's sales have decreased in recent years, whereas Van Leeuwen's have continued

to increase.  *Compare* JX31 (Rebel), *with* JX09 (Van Leeuwen). Rebel claims that packaging is a *de minimis* factor contributing to a customer's decision to purchase Rebel's products. Tr. 771:12-73:9 (Cragun).  But at the same time, Rebel's expert admitted on cross-examination that packaging "does have some value" to purchasers.  *Id.* at 779:4-21; PX259 (Rebel TikTok, emphasizing packaging).  Regardless, because of the keto trend driving sales, at least some reduction of the profits award is warranted to avoid a "windfall" for Van Leeuwen.

The EYP market study Rebel commissioned demonstrates that of Rebel's customer base, 33% purchased *only* better-for-you ice creams prior to purchasing Rebel.  PX074.39.  This metric is meaningful, because this portion of Rebel's sales are driven by purchasers who were never purchasers of Van Leeuwen's dairy line.  These sales thus did not unjustly enrich Rebel, nor do they approximate Van Leeuwen's possible damages.  *4 Pillar*, 933 F.3d at 212.

Accordingly, an equitable reduction of 33% is justified.  Van Leeuwen is entitled to a profits award of $23,785,000.

### III. Conclusion

For the reasons set forth above, Rebel is liable to Van Leeuwen for Lanham Act trade dress infringement, New York trade dress infringement and unfair competition, and dilution

64

under New York General Business Law § 360-l. Rebel's counterclaims are denied. Moreover, Rebel failed to show that it is entitled to the good-faith-remote-user affirmative defense. Rebel is enjoined from selling products that bear trade dress likely to be confused with Van Leeuwen's, and must redesign its packaging to avoid using the Van Leeuwen trade dress elements. Additionally, Van Leeuwen is entitled to $23,785,000 of Rebel's profits from selling infringing ice cream pints. The Clerk of Court is respectfully directed to enter judgment for plaintiff and to close the case.

       SO ORDERED.


                                      /s/ Eric Komitee
                                    ERIC KOMITEE
                                    United States District Judge


Dated:    July 16, 2026
          Brooklyn, New York